[No. D028639. Fourth Dist., Div. One. Sept. 29, 1998.]

MELALEUCA, INC., Plaintiff and Respondent, v.
HULDA REGEHR CLARK, Defendant and Appellant.

[No. D029533. Fourth Dist., Div. One. Sept. 29, 1998.]

HULDA REGEHR CLARK, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
MELALEUCA, INC., Real Party in Interest.

1346

## COUNSEL

Gray, Cary, Ware & Freidenrich, Marcelle E. Mihaila, Guylyn R. Cummins and Kathryn E. Karcher for Defendant and Appellant and for Petitioner.

Luce, Forward, Hamilton & Scripps, Charles A. Bird, Gregory D. Roper, Hinchy, Witte, Wood, Anderson & Hodges, A. Kendall Wood and Courtney A. Barnes for Plaintiff and Respondent and for Real Party in Interest.

## OPINION

**BENKE, J.**—If this appeal turned solely on the question of whether statements defendant and appellant Hulda Regehr Clark has published about products distributed by plaintiff and respondent Melaleuca, Inc. (Melaleuca), are true, there is little doubt Melaleuca would prevail. There is simply no scientific basis for Clark's conclusions about Melaleuca's products, and the acceptable scientific evidence which is in the record entirely refutes Clark's conclusions.

However, the law of defamation and the law of injurious falsehood require that a plaintiff prove far more than the publication of a false statement. Where, as here, the defendant has made false statements which disparage the contents of a product, the owner or distributor of the product is required to produce clear and convincing evidence the defendant acted with actual malice. A statement is made with actual malice when the publisher either knows the statement is false or has some serious subjective doubt about the truth of the statement.

Here the trial court erred in giving an instruction which permitted the jury to find actual malice on an objective basis. Because the jury found that Clark did not know her statements were false and because the record with respect to any doubts she had was in sharp conflict, the instruction prejudiced Clark. Accordingly, we reverse the judgment entered in favor of Melaleuca and vacate the postjudgment orders it entered.

### FACTUAL AND PROCEDURAL BACKGROUND

Melaleuca is in the business of selling a line of personal hygiene, cosmetic, household cleaning, over-the-counter pharmaceutical, nutrition and

pet care products. Most of the 110 products it markets contain tea tree oil derived from leaves of the melaleuca alternifolia, a tree which grows primarily in the Australian province of New South Wales.

Melaleuca's products are designed to meet a demand for natural products which are safe and effective. The company markets its products exclusively through a biannual catalog and a network of 170,000 independent marketing executives who sell Melaleuca products on a part-time basis as a supplement to their household income. Melaleuca does not advertise in print or electronic media but instead relies upon word of mouth and its sales network. In 1996 Melaleuca experienced gross monthly sales of between $3.5 million and $4.5 million.

Clark is an independent research scientist who operates a diagnostic center near Tijuana, Mexico. Clark claims to have discovered the cause and have a cure for all cancers, HIV/AIDS and a number of other serious illnesses. Briefly, Clark believes all cancers and many diseases are caused by existence of intestinal parasites and toxic substances in a person's body. Clark believes once an individual stops being exposed to the toxic substances, in particular, isopropyl alcohol and benzene, the individual's health will improve because the individual's immune system will be better able to resist the parasites which she believes are the direct cause of disease.

Clark claims she has been able to develop a device, a "syncrometer," which is capable of detecting the presence of carcinogenic chemicals, such as benzene, to one part per quadrillion. According to Clark, she can use the syncrometer to both test for the presence of benzene in particular products and in individual patients.

In two books she has published (The Cure for All Cancers (1993), and The Cure for HIV and AIDS (1993)), Clark states she has found benzene in a number of household products and foods, including Melaleuca's products. In a third book, The Cure for All Diseases (1995), Clark states she has found benzene in all tea tree oil products, except one product which is not marketed by Melaleuca. The three books Clark published had gross sales in excess of $7 million.

Melaleuca first learned of Clark's statements about its products in late 1994. In response, Melaleuca retained an independent laboratory to conduct tests of its product. The laboratory could not find any benzene in Melaleuca's products.

In March 1995, following receipt of the laboratory's report, Melaleuca sent Clark a letter in which it demanded she stop distributing her books. She

did not respond to Melaleuca's demand and in June 1995 Melaleuca sued Clark for libel, defamation, trade libel, negligence, negligent interference with prospective economic advantage, intentional interference with contractual relations and injunctive relief.

At trial Melaleuca moved *in limine* to prevent Clark from attempting to establish the truth of her statements by relying on syncrometer testing. In support of its motion, Melaleuca presented testimony from a chemist. The expert, using conventional gas chromatography and mass spectroscopy, could not find any benzene in the Melaleuca products he tested. Gas chromatography which separates components in a mixture and mass spectroscopy which identifies the components, can detect the presence of a chemical to 10 parts per million. The chemist further testified there was no accepted scientific basis for the syncrometer testing advocated by Clark in her books.

After hearing extensive testimony on the issue, the trial court granted Melaleuca's motion. The trial court determined Clark's syncrometer testing was not an accepted scientific procedure and that she could not use it to establish the existence of benzene in Melaleuca's products. However, the trial court did permit Clark to present evidence that she used the syncrometer in order to establish her state of mind at the time she published her books.

The trial court found that although Melaleuca was not a public figure, Clark's statements about its products were a matter of public concern. Accordingly, as a predicate to recovery of presumed and punitive damages, the trial court required that Melaleuca show that Clark either knew her statements were false or made them with reckless disregard of their falsity. In instructing the jury on Clark's state of mind, the trial court gave a modified version of BAJI No. 7.04.1 which, among other matters, defines reckless disregard of falsity in terms of whether the defendant *"must have had* serious doubts about the truthfulness of the statement at the time of the publication." (Italics added.) The jury returned a verdict in favor of Melaleuca on its defamation and interference with economic advantage claims.

The jury found Clark's statements were false, that although Clark did not know they were false, she nonetheless published the statements in reckless disregard of whether they were false. The jury also found Clark's statements interfered with Melaleuca's relationship with its marketing executives. In addition to these findings, the jury found Clark acted with the oppression, fraud and malice required to support an award of punitive damages under Civil Code section 3294.

On the defamation claims the jury awarded Melaleuca a total of $6,000 in special damages and $178,000 in presumed damages. With respect to the

economic interference .claims the jury found that Melaleuca suffered an additional $366,000 in compensatory damages. In addition to the compensatory damages the jury awarded Melaleuca $1 million in punitive damages. Following entry of judgment on the jury's verdict, the trial court granted Melaleuca a permanent injunction against Clark preventing her from publishing any defamatory statements about Melaleuca's products. Later, the trial court held Clark in contempt because it found Clark had violated its injunction. Clark challenged the validity of the postjudgment orders by filing a combined petition for writs of supersedeas, habeas corpus and certiorari. We stayed all trial court proceedings, consolidated the petition for extraordinary relief with the appeal and expedited consideration of the appeal.[1]

## DISCUSSION

### A. *Fact Versus Opinion*

The first issue Clark raises on appeal we resolve against her. She contends her statements about Melaleuca's products were not actionable because they were only statements of her opinion about Melaleuca's products.

" 'An essential element of libel . . . is that the publication in question must contain a false statement of *fact*. . . . This requirement . . . is constitutionally based.' [Citation.] 'However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.' [Citation.] A statement of opinion, however, may still be actionable 'if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.' [Citations.] 'The dispositive question for the court is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion. . . .' [Citations.]" (*Copp* v. *Paxton* (1996) 45 Cal.App.4th 829, 837 [52 Cal.Rptr.2d 831].)

Whether a statement is one of fact or opinion is a question of law to be decided by the court. (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) "In making such a determination, the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction. [Citation.] ' "That is to say, the publication

---

[1]In light of our stay, Clark's request for supersedeas is moot. Because Clark was never placed in custody, certiorari is the proper means of challenging the validity of the underlying orders. (8 Witkin, Cal. Procedure (4th ed.) Extraordinary Writs, § 33, pp. 811-812.)

is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." ' [Citation.]

"The distinction as to what is a statement of fact and what is a statement of opinion is frequently a difficult one. '[W]hat constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.' [Citation.]

"For these reasons, California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion. First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. [Citations.] Where the language of the statement is 'cautiously phrased in terms of apparency,' the statement is less likely to be reasonably understood as a statement of fact rather than opinion. [Citation.]

"Next, the context in which the statement was made must be considered. Since '[a] word is not a crystal, transparent and unchanged, [but] is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used[,]' the facts surrounding the publication must also be carefully considered. [Citation.]

"This contextual analysis demands that the courts look at the nature and full content of the communication and . . . understanding of the audience to whom the publication was directed. [Citation.] ' "[T]he publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it. [Citation.]" (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260-261, fn. omitted; see also *Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 13-16 [110 S.Ct. 2695, 2703-2704, 111 L.Ed.2d 1].)

██ Here, Clark's statements about Melaleuca's products are in no sense opinions. Clark's books state that based upon syncrometer testing, she

has discovered benzene in Melaleuca's products. Her books also contain an explanation of how syncrometers operate and how a reader can build his or her own syncrometer and perform the same tests Clark performed. The books advise readers to throw out Melaleuca products. In a number of case histories Clark presents in her book, she notes whether the patients have been using Melaleuca products and whether, in the course of treatment at her clinic, they stopped using the products. These statements are in no sense cast in terms of apparency or hesitation with respect to the question of whether the products Clark tested contain benzene.

In this regard, disclaimers in Clark's books in which she attempts to characterize her conclusions as only opinions are ineffective. Indeed, the statements she relies upon tend to reinforce, rather than undermine, the factual nature of her claims. For instance, in attempting to establish the nonfactual nature of her statements, Clark relies on a statement in the preface of her book that "[t]he opinions and conclusions expressed in this book are mine, and unless expressed otherwise, mine alone. The opinions expressed herein are based on my scientific research and on specific case studies involving my patients." The reference here to research and case studies plainly suggests a factual basis for Clark's statements. Thus, rather than lending any level of doubt or uncertainty, the disclaimer tends to reinforce the notion the book's contents are based on facts rather than opinion or theory.

Moreover, Clark's statements were not asserted in the context of a dispute or intellectual inquiry in which the audience might expect hyperbole, exaggeration or speculation. Rather, they are set forth in a lengthy book which, by extensive reference to case studies, attempts to provide proof of Clark's conclusions.

In sum then, we find no error in the trial court's determination Clark's books contained statements of fact about Melaleuca's products.

## B. *False Statements*

In her second argument on appeal, Clark contends the trial court erred in ruling *in limine* that she could not rely upon syncrometer testing to establish the truth of her statements. We also reject this argument.

Preliminarily, we note that where disputed statements involve matters of public concern, the plaintiff in a defamation action bears the burden of showing the statements the defendant made were false. (*Nizam-Aldine* v. *City of Oakland* (1996) 47 Cal.App.4th 364, 373 [54 Cal.Rptr.2d 781]; see

also *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 778 [106 S.Ct. 1558, 1564-1565, 89 L.Ed.2d 783].) Moreover, a defendant can always escape liability by establishing the alleged defamatory statements were in fact true. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 494, p. 583; *Gill* v. *Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306].)

■ Although we have not been able to locate a great deal of authority on the issue, we have little doubt that in a defamation action a plaintiff may, in given circumstances, rely upon expert testimony to establish the falsity of statements made by the defendant. (See *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 338-340.) Evidence Code section 801 permits a qualified expert to offer opinions on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." In cases, such as this one, where one of the underlying disputes between the parties is over the chemical or biological makeup of a particular material, although there are practical difficulties which we discuss more fully below, we see no inherent impediment to the use of expert testimony to establish the falsity of a factual statement in a defamation proceeding. Indeed, without the assistance of expert testimony, we are frankly at a loss as to how Melaleuca would ever be able to meet one of its principle burdens here, i.e., demonstrating the falsity of Clark's statements about the existence of benzene in its products.

Suffice it to say, having determined that a defamation *plaintiff* may use expert testimony to establish the falsity of a statement, we must recognize that a defamation *defendant* may also find it helpful or necessary to present expert testimony as to the truth of an allegedly defamatory statement. Not only is truth a complete defense to defamation, but the broad protection the First Amendment affords defamation defendants would be turned on its head if a defendant could not also use expert testimony to establish disputed statements were in fact true. Even false speech is protected by the Constitution so that true speech will never be discouraged (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at pp. 777-778 [106 S.Ct. at p. 1564]); plainly, that protection would be severely diminished if, unlike other litigants, defamation defendants were not allowed to establish the truth of a statement by way of expert testimony which meets the requirements of Evidence Code section 801.

■ Having recognized the propriety of using expert testimony in defamation actions, we next turn to the question of whether those experts are subject to one of the principle limitations which has been applied to their testimony, the so-called *Kelly* rule.

■ Under *Kelly,* when an expert offers testimony which is based upon the application of a new scientific technique, the party offering the expert's

testimony must demonstrate so that the technique " 'must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' " (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*).)[2] As the court in *Kelly* noted: "The primary advantage . . . of the . . . test lies in its essentially conservative nature. For a variety of reasons, [the test] was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles. 'There has always existed a considerable lag between advances and discoveries in scientific fields and their acceptance as evidence in a court proceeding.' [Citation.] Several reasons found in logic and common sense support a posture of judicial caution in this area. Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' [Citations.] . . . '[S]cientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury . . . .' " (*Kelly, supra*, 17 Cal.3d at pp. 31-32.)

We can discern no reason litigants in a defamation action should be able to avoid the constraints of *Kelly* when they propose to offer expert testimony based on a new scientific technique as a means of proving or disproving the truth of an alleged defamatory statement. When, as here, the truth or falsity of a statement is in dispute between the parties, both plaintiffs and defendants have an interest in preventing use of purely experimental techniques to persuade the trier of fact on the issue. A defamation plaintiff has an acute interest in preventing a false statement from gaining currency by way of unaccepted scientific techniques; a defamation defendant has an even more pointed interest in avoiding the imposition of liability imposed based on such unproven techniques. Moreover, as we explain in greater detail below, a defamation defendant has other important defenses which protect it from liability even when it has relied on unproven scientific techniques.

Here, Clark proposed to prove the existence of benzene in Melaleuca's products by way of syncrometer testing. However, she offered no proof that her syncrometer testing has been accepted in the field of chemistry. Indeed, she admits as much in her books. Thus, notwithstanding her criticism of the expert offered by Melaleuca, Clark could not show syncrometer

[2]The federal counterpart to the *Kelly* rule, *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46], has been replaced by *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 589 [113 S.Ct. 2786, 2794-2795, 125 L.Ed.2d 469], which does not require general acceptance in the scientific community but instead requires that the trial judge find that proffered scientific evidence will assist the trier of fact to understand or determine a fact issue. (*Id.* at pp. 592-593 [113 S.Ct. at pp. 2796-2797].)

testing meets the requirements of *Kelly* and accordingly the trial court did not error in preventing her from using syncrometer testing as a means of proving the truth of her statements.

## C. *Culpability*

As the court in *Kelly* stated, its requirements are essentially conservative and designed to limit the type of information a *jury* may consider when scientific evidence is offered to prove a particular fact. In contrast, the law governing defamation and injurious falsehood is essentially liberal and designed to assure the free flow of information in our society. (See *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at pp. 772-774 [106 S.Ct. at pp. 1561-1562].) The principal means by which the flow of information is protected is the requirement that a defamation or injurious falsehood plaintiff prove a defendant acted with some degree of culpability. (*Ibid.,* see also *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742-746 [257 Cal.Rptr. 708, 771 P.2d 406].) As we explain more fully below, in the context of alleged false statements about the contents of a product, the plaintiff must demonstrate the highest degree of culpability: the defendant's actual knowledge of falsity or actual serious doubts by the defendant as to truth of his or statements.

### 1. *Constitutional Limitations on Defamation Liability*

In *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at pages 772-774 [106 S.Ct. at pages 1561-1562], the court summarized the now familiar constitutional limits it has imposed on defamation liability: "Freedoms of expression require ' "breathing space," ' [citation]: 'A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to . . . "self-censorship.". . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.' [Citation.]

"The Court [in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412]] therefore held that the Constitution 'prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citation.]

"That showing must be made with 'convincing clarity,' [citation] or, in a later formulation, by 'clear and convincing proof,' [citation]. The standards of *New York Times* apply not only when a public official sues a newspaper, but also when a 'public figure' sues a magazine or news service. [Citations.]

"A decade after *New York Times* [in *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed. 789]], the Court examined the constitutional limits on defamation suits by private-figure plaintiffs against media defendants. [Citation.] The Court concluded that the danger of self-censorship was a valid, but not the exclusive, concern in suits for defamation: 'The need to avoid self-censorship by the news media is . . . , not the only societal value at issue . . . [or] this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation.' [Citations.] Any analysis must also take into account the 'legitimate state interest underlying the law of libel [in] the compensation of individuals for the harm inflicted on them by defamatory falsehood.' [Citations.] In light of that interest, and in light of the fact that private figures have lesser access to media channels useful for counteracting false statements and have not voluntarily placed themselves in the public eye, [citation], the Court held that the Constitution 'allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*,' [citation]: '[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.' " (*Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at pp. 772-774 [106 S.Ct. at pp. 1561-1562].)

California, like 33 other states, permits defamation liability so long as it is consistent with the requirements of the United States Constitution. (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at pp. 740-742.) "We see no reason to deny California citizens protection for their reputations equal to that provided in other states. We decline to diverge from the near unanimous authority that a private person need prove only negligence (rather than malice) to recover for defamation." (*Id.* at p. 742.) Importantly, in doing so our Supreme Court reiterated the United States Supreme Court's observation that " 'the individual's right to the protection of his own good name "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." ' " (*Id.* at p. 744, quoting *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 341 [94 S.Ct. 2997, 3008, 41 L.Ed.2d 789].)

However, while the Constitution permits private individuals to recover liability for damage to their reputation on the basis of negligence, there are

important limitations on the scope of that liability. Where, although the defamed plaintiff is a private party, the alleged defamatory statement is a matter of public concern, the plaintiff may not recover presumed or punitive damages without showing actual malice. (*Brown* v. *Kelly Broadcasting Co., supra*, 48 Cal.3d at p. 747.)

2. *Injurious Falsehood*

■ Here in addition to the public or private status of Melaleuca or the public interest in Clark's statements, in the context of this case, we are required to consider an additional factor: whether Clark's statements defamed the reputation of Melaleuca or merely disparaged products it owns or markets. It is plain that only statements which directly damage a plaintiff's reputation will give rise to liability without a showing of actual malice.

We are led to this conclusion first by the consistent rationale of cases which have permitted defamation liability to be imposed on the basis of negligence alone. As we have noted, those cases permit liability to be imposed where less than actual malice has been shown because of the relatively high value we place on individual dignity and reputation. (See *Brown* v. *Kelly Broadcasting Co., supra*, 48 Cal.3d at pp. 721-723, 742-746; *Gertz* v. *Robert Welch, Inc., supra*, 418 U.S. 323, 343 [94 S.Ct. 2997, 3008-3009].) It follows that where a defendant's statements do not impugn the reputation of a plaintiff, there is considerably less justification for permitting liability to be imposed on the basis of negligence alone. Where the unique interest individuals and business organizations have in their reputations is not implicated, the public's interest in avoiding self-censorship requires application of a higher standard of culpability. (See *Bose Corp.* v. *Consumers U. of U.S., Inc.* (D.Mass. 1981) 508 F.Supp. 1249, 1270-1271, revd. on other grounds 692 F.2d 189 (1st Cir. 1982), affd. 466 U.S. 485 [104 S.Ct. 1949, 80 L.Ed.2d 502].)

However, the distinction between statements impugning reputation and those simply disparaging products is not one which rests solely upon an extension of the rationale employed in cases permitting liability to be imposed on a finding of negligence. Rather, the distinction is one which the common law itself recognizes. The protection the common law provides statements which disparage products as opposed to reputations is set forth in the Restatement Second of Torts sections 623A and 626. Section 623A provides: "One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if [¶] (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize

that it is likely to do so, and [¶](b) *he knows that the statement is false or acts in reckless disregard of its truth or falsity.*" (Italics added.)

Section 626 of Restatement Second of Torts in turn states: "The rules on liability for the publication of an injurious falsehood stated in § 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property."

The well-established legal ramifications of impugning a product rather than a reputation are set forth in comment g to Restatement Second of Torts section 623A, page 341: "From the beginning, more stringent requirements were imposed upon the plaintiff seeking to recover for injurious falsehood in three important respects—falsity of the statement, fault of the defendant and proof of damage. At common law a defamatory statement was presumed to be false and truth was a matter to be proved by the defendant; in an action for injurious falsehood, the plaintiff must plead and prove that the statement is false. At common law, a defendant in a defamation action was held to strict liability insofar as falsity of the statement was concerned; in an action for injurious falsehood he was subject to liability only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interests of the plaintiff in an unprivileged fashion. In defamation, it was only in limited number of situations that a plaintiff was required to prove special damages; in injurious falsehood, pecuniary loss to the plaintiff must always be proved."

According to the Restatement commentators, the Supreme Court borrowed the preexisting and well-established scienter requirement governing trade libel and product disparagement cases when it imposed the actual malice standard for defamation actions against public officials. (Rest.2d Torts, § 623A, p. 338, com. d.) "A principal basis for liability for injurious falsehood has been that the publisher knew that the statement was false or that he did not have the basis of knowledge or belief professed by his assertion. This is the same test as that for scienter in the tort of deceit. [Citation.] It was borrowed by the Supreme Court and applied to defamation actions brought by public officials (with public figures later included), in New York Times Co. v. Sullivan (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412], where the Court first gave it the title of 'actual malice.' In recent cases the Court has been less inclined to use that appellation and has posed the requirement in terms of knowledge of falsity or reckless disregard as to truth or falsity. The test remains the same.

[Citation.] The common law of injurious falsehood and the constitutional limitations on the action for defamation therefore coincide on this basis for liability, which is therefore expressed in Clause (b) of the blackletter." (*Ibid.*)[3]

In sum the common law has always distinguished between statements which impugn a person's reputation and those which disparage a product and it has always given the owner or marketer of a product very limited rights against the publisher of statements which disparage the product. Given the limited interest the common law recognizes in protecting products and the constitutional preference for the free exchange of ideas, we believe it is clear the Constitution will not permit liability to be imposed for injurious falsehood absent a showing of actual malice. Thus, the question of whether Clark's statements impugned Melaleuca's reputation or only its products is in the end a matter of constitutional dimension.

### 3. *Melaleuca's Claims*

#### a. *Melaleuca's Status*

Here, we agree with Melaleuca that its status as a private or public figure is controlled by the holding in *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763, 769-771 [160 Cal.Rptr. 97, 603 P.2d 14] (*Vegod*).) There, a television station broadcast a report which stated the plaintiffs, which were corporations engaged in retail sales, were not conducting their business in an ethical manner. In particular, the broadcast suggested that the plaintiffs were purporting to offer bargain prices on quality goods when in fact the quality of the goods they were offering was not very high. The court in *Vegod* held that neither the fact the plaintiffs were corporations nor the fact they had advertised their products deprived them of their status as private individuals who could recover from the defendants upon a showing of negligence. (*Ibid.*)

With respect to the plaintiffs' corporate existence, the court in *Vegod* explained: " '[T]here is no distinction between the protectible interest in reputation of corporations and individuals and the former as much as the latter may recover special, general and punitive damages.' " (*Vegod, supra,* 25 Cal.3d at p. 770.) Thus, like individuals, unless business entities have purposefully interjected themselves into a public controversy, they need only

---

[3]We note that although courts have had some difficulty with the tort of injurious falsehood, the tort is well recognized and the Restatement's views have been accepted as a valid basis for distinguishing between defamation and trade libel. (*Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 548-550 [216 Cal.Rptr. 252]; see also *Leonardini* v. *Shell Oil Co.* (1989) 216 Cal.App.3d 547, 572 [264 Cal.Rptr. 883].)

show they were the victims of a negligent misstatement of fact in order to recover for defamation. (*Vegod, supra*, 25 Cal.3d at p. 771.)

In finding that advertising goods for sale does not make the seller a public figure, the court stated: "Criticism of commercial conduct does not deserve the special protection of the actual malice test. Balancing one individual's limited First Amendment interest against another's reputation interest [citation], we conclude that a person in the business world advertising his wares does not necessarily become part of an existing public controversy. It follows those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur." (*Vegod, supra*, 25 Cal.3d at p. 770, fn. omitted.)

Plainly, under *Vegod*, Melaleuca's marketing activities did not make it a public figure or create a public controversy such that Melaleuca was required to show that defamatory statements about it were made with actual malice.

### b. *Public Concern*

As we have noted the trial court found Clark's statements about the contents of Melaleuca's product were a matter of public concern. This finding is fully supported by the record.

Contrary to Melaleuca's argument, the public interest in Clark's statements does not depend on whether the statements were true. "[A]ll libel, by definition, is false." (*Carney* v. *Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1021 [271 Cal.Rptr. 30].) ▉ Rather, in determining whether there is a legitimate public concern in statements about a private individual, "a more appropriate inquiry is whether . . . the form, context and content of the publication as a whole demonstrate that a matter of public concern is implicated." (*Ibid.*)

▉ Here, the public has a well-recognized interest in knowing about the quality and contents of consumer goods. (See, e.g., *Bose Corp.* v. *Consumers U. of U.S., Inc., supra*, 508 F.Supp. at pp. 1270-1271.) Moreover, Clark's statements were made in the context of books espousing her scientific theories and advocating the adoption of what she believes are healthy nutritional practices and the avoidance of substances she believes cause serious illness. Notwithstanding any defects in her science, her statements addressed matters of obvious widespread public interest.

Thus, in order to recover presumed or punitive damages, Melaleuca was required to present clear and convincing evidence Clark acted with actual malice.

### c. *Injury to Products or Reputation*

Melaleuca argues that in the trial court Clark gave up any claim Melaleuca would have to meet the requirements of trade libel. Our review of the record does not support this contention. Rather, considered in its entirety, the instruction conference, upon which Melaleuca relies, makes it clear that at all times the parties were acutely aware of the higher burden required by trade libel and that Clark always insisted that because of the nature of Melaleuca's claims, Melaleuca had to meet that burden. The only concession Clark made in the trial court was in permitting the defamation and trade libel claims to be considered together. This concession does not prevent Clark from insisting, as she did at oral argument, that Melaleuca's claims were for trade libel.

In determining whether Clark's statements were directed solely at Melaleuca's products and thus required proof of actual malice, we are assisted by comment g to Restatement Second of Torts section 623A which states: "Although the torts of defamation and injurious falsehood protect different interests, they may overlap in some fact situations. This happens particularly in cases of disparagement of the plaintiff's business or product. *If the statement reflects merely upon the quality of what the plaintiff has to sell . . . , then it is injurious falsehood alone.* Although it might be possible to imply some accusation of personal incompetence or inefficiency in nearly every imputation directed against a business or a product, the courts have insisted that something more direct than this is required for defamation. On the other hand, if the imputation fairly implied that the plaintiff is dishonest or lacking in integrity or that he is perpetrating a fraud upon the public by selling something that he knows to be defective, the personal defamation may be found. In this case, it is common to sue in defamation because the damages are more comprehensive." (Rest.2d Torts, § 623A, com. g, p. 341, italics added.)

Here, Clark did not make any statements about the manner in which Melaleuca conducts its business, its honesty, or its reliability. Rather, Clark only made statements about what she believes she found in the products Melaleuca markets. Because Clark's books take great pains to point out that she was the developer of a revolutionary technique which the scientifc community has not yet accepted, there is no intimation in her books about the character of Melaleuca or the honesty of its business practices.

Because Clark's statements were about products, which have no reputation entitled to protection by the law of defamation, both the common law and the Constitution require a showing of knowledge on Clark's part that her

statements were false or that she acted recklessly in making them. (See 5 *Witkin,* Summary of Cal.Law, *supra,* Torts, §§ 567-569, pp. 661-663.)

In sum then, although Melaleuca is not a public figure, because Clark's statements addressed a matter of public concern and were directed towards Melaleuca's products rather than its reputation, the judgment in favor of Melaleuca cannot be affirmed in whole or in part unless the record supports the jury's finding that Clark acted with actual malice.

### 4. *Actual Malice Instruction*

 Unfortunately, the jury was not properly instructed on the requirements of actual malice. As we have noted the trial court gave the jurors a version of BAJI No. 7.04.1 which instructed them that they could find actual malice if Clark "must have had" serious doubts about the truth of her statements. Clark argues this phrase was confusing because it suggested to the jury that so long as a reasonable person in Clark's position would have had serious doubts about the truthfulness of her statements, she acted with actual malice. We agree.

The law is clear the recklessness or doubt which gives rise to actual or constitutional malice is subjective recklessness or doubt. (See *Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 511, fn. 30 [104 S.Ct. 1949, 1965, 80 L.Ed.2d 502].) Moreover, in determining whether a defendant has subjective knowledge or doubt about the accuracy of a statement, the Supreme Court has repeatedly eschewed reasoning based on what a defendant "must have realized." (*Id.* at p. 512 [104 S.Ct. at p. 1966]; see also *Time, Inc.* v. *Pape* (1970) 401 U.S. 279, 284 [91 S.Ct. 633, 636-637, 28 L.Ed.2d 45].) Such reasoning may be adequate when an alleged libel purports "to be an eyewitness or other direct account of events that speak for themselves" (*Time, Inc.* v. *Pape, supra,* 401 U.S. at p. 285 [91 S.Ct at p. 637]), "such as that a policeman has arrested a certain man on a criminal charge." (*Id.* at p. 286 [91 S.Ct. at p. 637].) However, such deductive analysis is inadequate when the libel is based on choices the defendant has made in describing what others have written or said (*ibid.*) or, as was the case here, drawing conclusions from extensive or complex research. (See *Bose Corp.* v. *Consumers Union of U.S., Inc., supra,* 466 U.S. at pp. 512-513 [104 S.Ct. at p. 1966].) While in hindsight, or with the benefit of other evidence, it might be perfectly obvious to a trier of fact that a particular description of events or conclusion is erroneous, in most cases the obviousness of the defendant's error will not create any convincing inference of doubt on his or her part.

(*Ibid.*) Because the court's instruction permitted such an inference to drawn, the trial court erred in giving it.[4]

 "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 570-571 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

 Here, the evidence with respect to Clark's subjective beliefs was very close and fell into four broad categories: (1) evidence of the manner in which she developed her theories, (2) evidence of the manner in which she applies her theories, (3) evidence of the successful manner in which she and her family have exploited her theories and (4) evidence which directly undermines the validity of her theories. The record on Clark's state of mind was in sharp conflict: One can argue from the record that she is a complete charlatan, who, like a 19th-century peddler of patent medicines, knows full well her claims are unsupportable; on the other hand, one can look at the record and see someone who is as convinced and sincere about her findings as any of history's scientific iconoclasts.

Melaleuca's counsel contributed to the jury's confusion as to what proof was needed to establish malice when he argued that in light of her scientific credentials, Clark must have had serious doubts about her statements. Of particular importance too is the fact the jury found Clark did not know her statements were false. Given the substantial evidence of her sincerity, the jury's knowledge finding strongly suggests the jury's finding on reckless-ness was based on its conclusion that, while Clark may not have known her statements were false, she should have known they were false. In light of all these circumstances we have little doubt that Clark would have obtained a more favorable verdict had the jury been properly instructed.

CONCLUSION

Because the jury was not properly instructed on actual malice, insofar as the judgment against Clark is for defamation or injurious falsehood, it must

---

[4]Given the unique constitutional considerations which arise in the area of defamation and injurious falsehood, our difficulty with the phrase "must have had" as it is used in BAJI No. 7.04.1 has little if any bearing on similar phrases which appear in BAJI Nos. 12.31, 12.35, 12.40 and 12.45 where the phrase is used to describe the scienter requirements for fraud and deceit.

be reversed. There remains the fate of Melaleuca's remaining claims for invasion of Melaleuca's relationship with its marketing executives. Those claims are governed by the principle that "[i]f a statement is protected, either because it is true or because it is privileged, that ' "protection does not depend on the label given the cause of action." ' " (*Francis* v. *Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 540 [4 Cal.Rptr.2d 361].) Accordingly, the judgment as to those claims must also be reversed.

Having reversed the judgment upon which the trial court's postjudgment injunction against Clark was based, we must also vacate the injunction and the trial court's contempt findings. Although we do not reach the issue, we nonetheless note that at least one court has suggested that an injunction is never available in a defamation action and only available in a case of trade libel where there is no public interest in the parties' dispute. (See *Leonardini* v. *Shell Oil Co., supra*, 216 Cal.App.3d at p. 574.)

Judgment reversed; petition for certiorari granted as to the postjudgment orders. Appellant to recover her costs of appeal.

Kremer, P. J., and Haller, J., concurred.

A petition for a rehearing was denied October 20, 1998, and the petition of respondent Melaleuca, Inc., for review by the Supreme Court was denied January 13, 1999.