Filed 12/17/14   Friedman v. Regents CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES FRIEDMAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>    Defendants and Respondents. | B245406 c/w B259167<br><br>(Los Angeles County<br>Super. Ct. No. BC445059) |

APPEAL from judgments of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Judgment in favor of the Regents is affirmed.  Judgment in favor of Horak and Qedwai is reversed with directions.

Savarese Law Firm and Melanie Rasic Savarese; Steven B. Stevens for Plaintiff and Appellant.

Reed Smith, Paul D. Fogel, Dennis Peter Maio and Ilana R. Herscovitz; Atkinson, Andelson, Loya, Ruud & Romo and Irma Rodriguez Moisa and Sharon J. Ormond for Defendants and Respondents.

Plaintiff and appellant James Friedman appeals from the judgment after jury trial in favor of defendant and respondent the Regents of the University of California (Regents), in his employment discrimination action. Friedman argues that the trial court prejudicially erred in three evidentiary rulings. We conclude there was no prejudicial error and therefore affirm. Friedman also appeals from the judgment after summary adjudication, and the denial of his motion to file an amended complaint, against defendants and respondents Jan-Christopher Horak and Rehan Qedwai, on his cause of action for defamation. Friedman argues that the trial court erred in concluding all of the allegedly defamatory statements were non-actionable opinion. We conclude that while several of the allegedly defamatory statements were, in fact, non-actionable opinion, several such statements were not. The trial court therefore erred in denying leave to amend on the basis that all of the defamatory statements constituted opinion. We therefore reverse to allow Friedman to potentially pursue his defamation cause of action.

## FACTUAL BACKGROUND

Friedman was employed by the Regents at the UCLA Film and Television Archive (Archive), which is part of the UCLA School of Theater, Film and Television (TFT). He was initially hired in 1994, and was indefinitely laid off[1] on April 13, 2010. At the time of his layoff, Friedman was the head of "Commercial Services" for the Archive. The director of the Archive, and Friedman's direct supervisor, was Horak. The chief financial officer and chief administrative officer of the Archive was Qedwai.

Although Friedman worked on multiple projects for the Archive, one particular project requires further discussion. The Archive had been given the Hearst Newsreel Collection. Over a seven-year period, Friedman worked with IBM to create a digital catalog and search engine for the Hearst Newsreel Collection. The project remained unfinished when Friedman was laid off. The reason the project was never completed is

---

[1] There is a difference between a layoff and a termination of employment at UCLA. Having been laid off, Friedman was entitled to certain preferential rehiring rights. He was permitted to waive those rights in exchange for severance pay.

2

disputed. Friedman suggests that, over time, the goals of the project changed, and that the necessary technology was not readily available. Some at the Archive, however, believed that the lack of progress on the IBM project was, in part, Friedman's responsibility.

The reasons for Friedman's layoff were hotly disputed. Friedman took the position that he was laid off due to his age (51) and/or in retaliation for his complaints about gender discrimination suffered by other employees.[2] The Regents took the position that Friedman was laid off due to restructuring; Friedman's position was eliminated and the employees who had reported to him were assigned to different supervisors. However, the Regents also conceded that the restructuring had not been planned to occur when it did. Instead, Horak had planned to restructure away Friedman's position sometime in the future, but accelerated that restructuring when he believed Friedman had been insubordinate.

## PROCEDURAL BACKGROUND

On September 3, 2010, Friedman filed his complaint against the Regents, Horak and Qedwai. The operative complaint is the second amended complaint, filed March 17, 2011. Horak moved for summary adjudication of the defamation cause of action against him, on the basis that Friedman could not establish that Horak made false statements of *fact*. In opposition, Friedman relied on numerous purportedly defamatory statements which had not been alleged in his complaint. Indeed, he relied on some statements made by Qedwai, although Qedwai had not even been named in Friedman's defamation cause of action. At the hearing on the motion, Friedman sought leave to amend his complaint to include these additional purportedly defamatory statements. The trial court indicated that if Friedman wanted leave to amend, he had to file a motion seeking such leave. The motion for summary adjudication was granted on the basis that

---

[2]     In his initial complaint in this action, Friedman also alleged that he was improperly laid off due to his religion and/or in retaliation for his whistleblowing regarding certain illegal acts of his supervisors. Those causes of action were resolved in favor of the Regents prior to trial, and are not at issue in the instant appeal.

the allegations of defamation in Friedman's complaint were mere opinion, and not actionable defamatory statements.

Friedman then filed a motion for leave to amend, so that he could allege the additional defamatory statements purportedly made by Horak and Qedwai. The trial court denied the motion, on the basis that the purportedly defamatory statements alleged in the proposed third amended complaint were statements of opinion which, on their face, were not defamatory.

Ultimately, Horak and Qedwai obtained judgment on the pleadings on the sole remaining cause of action alleged against them. The case proceeded to trial against the Regents alone, on three causes of action: (1) age discrimination; (2) retaliation; and (3) failure to prevent retaliation.[3] After an 11-day trial, the jury was presented with a special verdict form. After less than 90 minutes of deliberation, the jury returned its unanimous verdict in favor of the Regents. As to age discrimination, the jury answered "No" to the question, "Was James Friedman's age a motivating factor for [the Regents'] . . . separation of James Friedman's employment?" As to retaliation, the jury answered "No" to the question, "Did James Friedman complain of or oppose gender . . . discrimination in his employment with [the Regents]?" Judgment was entered in favor of the Regents. Friedman filed a timely notice of appeal. Thereafter, judgment was entered in favor of Horak and Qedwai. Friedman filed a timely notice of appeal. We consolidated the two appeals.

## ISSUES ON APPEAL

On appeal from the judgment in favor of Horak and Qedwai, Friedman argues the trial court erred in that the allegedly defamatory statements in his second amended complaint and proposed third amended complaint were provably false statements of fact, not non-actionable opinion. We conclude that the great bulk of the statements constitute non-actionable opinion as a matter of law. However, several of the statements either are, or imply the existence of, provable facts. The court therefore

---

**3** The third cause of action, for failure to prevent retaliation, was mooted with the jury's resolution of the retaliation cause of action.

4

should not have denied leave to amend Friedman's complaint on the basis that all of the purportedly defamatory statements were non-actionable opinion.

On appeal of the judgment in favor of the Regents, Friedman contends the trial court prejudicially erred on three evidentiary matters: (1) the trial court excluded all evidence of gender discrimination of which Friedman concededly did not complain; (2) the court excluded all evidence of retaliation against others who had complained of gender discrimination; and (3) the court admitted, over Friedman's objection, a two-page document reflecting the income generated to the Archive by activities Friedman managed both before and after his layoff. We conclude that, in light of the jury's verdict, Friedman has failed to establish prejudicial error. We therefore affirm the judgment in favor of the Regents.

## DISCUSSION

### 1.  *Judgment in Favor of Horak and Qedwai*

The judgment in favor of Horak and Qedwai was based on the trial court's conclusion that the statements alleged in both Friedman's operative complaint and his proposed third amended complaint constituted non-actionable opinion, rather than provably false statements of fact. We set forth the law governing this distinction, then consider the allegedly defamatory statements.

Defamation is either libel or slander. (Civ. Code, § 44.) In this case we are concerned with allegations of both types of defamation. "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which . . . has a tendency to injure him in his occupation." (Civ. Code, § 45.) Slander is "a false and unprivileged publication, orally uttered," (Civ. Code, § 46), which "[t]ends directly to injure [any person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits." (Civ. Code, § 46, subd. 3.) " ' " 'The sine qua non of

5

recovery for defamation . . . is the existence of falsehood.' [Citation.]" ' [Citation.]" (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 426.)

To be defamatory, a " ' "statement must contain a provable falsehood . . ." ' and, to this end, ' "courts distinguish between statements of fact and statements of opinion for purposes of defamation liability." ' [Citation.] [¶] Not all statements that appear to be opinions, however, are immunized. [Citation.] 'In *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 17 [], the United States Supreme Court moved away from the notion that defamatory statements categorized as opinion as opposed to fact enjoy wholesale protection under the First Amendment. Significantly, the court recognized that "expressions of 'opinion' may often imply an assertion of objective fact." [Citation.] The court went on to explain: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications . . . . " [Citation.]' [Citations.]" (*Bently Reserve LP v. Papaliolios, supra,* 218 Cal.App.4th at pp. 426-427.)

" 'Thus a false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable. [Citation.] The key is not parsing whether a published statement is fact or opinion, but "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." [Citation.]' [Citation.] For example, 'an opinion based on implied, undisclosed facts is actionable if the speaker has no factual basis for the opinion' but '[a]n opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true.' [Citation.]" (*Bently Reserve LP v. Papaliolios, supra,* 218 Cal.App.4th at p. 427.)

"Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. [Citations.]" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 290.) "However, . . . some statements are ambiguous and cannot

be characterized as factual or nonfactual as a matter of law. 'In these circumstances, it is for the jury to determine whether an ordinary reader would have understood the [statement] as a factual assertion . . . . ' [Citations.]" (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1608.)

"We apply a ' "totality of the circumstances" ' test to determine both whether (a) a statement is fact or opinion, and (b) a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made. [Citations.]" (*Hawran v. Hixson, supra,* 209 Cal.App.4th at p. 289.) " ' "This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed. [Citation.] ' "[T]he publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope [of the publication]. [Citations.]" ' " ' [Citation.]" (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1338.) "An alleged defamatory statement is actionable only if the statement, 'considered within the context of the entire broadcast,' could be reasonably interpreted in the manner alleged by the plaintiff. [Citation.] If no reasonable viewer could have reasonably understood the statement in the alleged defamatory sense, the matter may be decided as a question of law. [Citation.]" (*Id.* at p. 1339.) " 'In making such a determination, the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction. [Citation.]' " (*Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1354.)

While couching a factual statement in terms of opinion does not absolve the speaker from liability, the phrasing of a statement can give rise to an inference that the statement is truly a non-actionable statement of opinion. When a statement "is 'cautiously phrased in terms of apparency' [citation] [and] is nothing more than

7

speculation or rumination," it is not actionable. (*Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1609.) Similarly, beginning a statement with " '[M]y impression is' " signals to the reasonable listener or reader "that the maker is not vouching for its accuracy" and that a statement of opinion, not fact, is to follow. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261.)

In the specific context of employment, there are solid policy reasons for not permitting defamation actions based on communications in employment performance evaluations given to employees. (*Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 964.) The types of comments in an employer evaluation tend to be mere statements of opinion, not statements of fact. (*Id.* at p. 971.) A "statement by [a] supervisor accusing [an employee] of 'poor performance' is clearly a statement of opinion. It does not suggest any lack of honesty, integrity or competency on [the employee's] part nor does it impute any reprehensible personal characteristic." (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1154.) However, if the supervisor tells others that the employer made a specific error on a specific project, the statement is actionable as "a statement of fact susceptible to proof or refutation by reference to concrete, provable data." (*Ibid.*)

With this background, we turn to the allegations of defamation in Friedman's complaint and his proposed amended complaint. We must determine whether, as a matter of law, each of the proposed defamatory statements is solely a statement of non-actionable opinion.

        a.     *Statements in Friedman's Complaint*

The allegedly defamatory statements supporting the cause of action for defamation in Friedman's operative complaint relate to statements Horak allegedly made after Friedman was laid off. According to Friedman, Horak "told various non-essential personnel at UCLA over conference calls with several people in attendance, in addition to third parties at IBM, that Mr. Friedman performed substandard work while at the Archive. Horak said to these same people that Mr. Friedman was not up to the job . . . . " Friedman alleged that this was false; his

8

work was actually "exemplary." Similarly, Friedman alleged that Horak told other individuals at the Archive that Horak had "given '[Friedman] every opportunity to go with the program and he chose not to.' " Friedman alleged that this was false, in that he was, in fact, "100% devoted to the Archive and to the Regents."

Considering the totality of the circumstances surrounding each statement, we conclude that the statements were non-actionable opinion as a matter of law. Whether Friedman's work was "substandard," whether Friedman was "up to the job," and whether Friedman chose to "go with the program" are all simply Horak's opinions of Friedman's work. Horak subjectively believed Friedman's performance was not what it should have been; the statements did not imply that Horak had knowledge of any specific, objectively-verifiable facts establishing a lack of competence. The trial court therefore did not err in granting summary adjudication in favor of Horak on Friedman's defamation cause of action.

### b. *Statements in Friedman's Proposed Amended Complaint*

In his proposed third amended complaint, Friedman alleged numerous additional statements allegedly made by Horak and Qedwai, in support of his defamation cause of action.[4] The statements are set forth in three allegedly defamatory e-mails or letters.

---

[4] The question arises as to whether Friedman's motion for leave to amend the defamation cause of action in his complaint was procedurally barred, given that it followed the trial court's grant of summary adjudication on this cause of action. We conclude that it was not. As a general rule, the pleadings delimit the issues to be considered on a motion for summary judgment or summary adjudication, and new, unpleaded issues cannot be raised for the first time in opposition to the motion. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.) However, "[u]pon a motion for summary judgment, amendments to the pleadings are readily allowed. [Citation.] If a plaintiff wishes to expand the issues presented, it is incumbent on the plaintiff to seek leave to amend the complaint either prior to the hearing on the motion for summary judgment, or at the hearing itself. [Citation.]" (*Id.* at p. 1258.) In this case, Friedman timely sought leave to amend, at the hearing on the motion for summary adjudication. The trial court responded that Friedman should file a noticed motion seeking leave to amend. While it might have been preferable for the trial court to have withheld ruling on the motion for summary adjudication until it could have determined the merits of the motion for leave to amend, the court instead chose to rule on the motion for summary

### 1. *Horak's April 2, 2010 E-Mail to the Dean*

On April 2, 2010, Horak wrote the Dean of TFT, seeking "advice on a personnel issue that has been a vexing problem for a long time." In the e-mail, Horak set forth his concerns regarding Friedman's performance. Horak, at times, speculated regarding Friedman's motives, and explained the basis for these speculations. Friedman contends that several statements in the e-mail (and one implied by it) are defamatory.

Considered in context,[5] we conclude that many of the allegedly defamatory statements in this e-mail are non-actionable opinions, which do not imply assertions of

adjudication as presented (with respect to only the issues raised in the operative complaint) and subsequently consider the request for leave to amend. As the court itself suggested that Friedman proceed by a separate motion for leave to amend, it is apparent that the court considered its ruling granting summary adjudication to apply only to the cause of action as originally pleaded, subject to amendment depending on its subsequent ruling on the motion for leave to amend.

[5]     The entire body of the e-mail is set forth below. The statements which Friedman contends are defamatory have been italicized.
      "I know we have a meeting next Tuesday, but I really need your advice on a personnel issue that has been a vexing problem for a long time. As you know, it has been one of my goals since taking over the directorship of the Archive to integrate our unit back into TFT, just as I know this is one of your major goals. Your strategic plan and goals for the Archive are a giant step in that direction, and I know you support our efforts to coordinate initiatives, especially with potential funders and outside commercial interests who may partner with TFT to generate income. Through the strategic planning process, I'm happy to say that *the Archive's senior staff is very supportive of your initiatives, except one person*.
      "Since I think you have met Bob Yacenda from IBM, I also think you are aware of the fact [TFT employees] Peter and Tamara have been attempting unsuccessfully to set up a meeting with Steve Canepa from IBM to discuss a whole range of TFT projects. For quite a while I have been wondering why they can't get on his calendar and I believe I have at least a plausible theory. I now believe that *the head of the Archive's Commercial Services, James Friedman, has been undermining Peter's efforts*, because he is of the opinion that he alone should be the only point of contact with IBM. Let me explain.
      "As mentioned in the strategic plan draft, IBM has been partnering with the Archive to create a digital catalogue and search engine for the Hearst Collection. IBM has donated equipment (hardware) and leveraged software for the campus servers, as well as for the Archive's Hollywood office. However, Mr. Friedman has from the start

10

independently guided the project with spotty oversight by previous management. *Documents formulating goals and deliverables over the life of the project were never completed and my requests for the same have been stone-walled.* Thus, goals have morphed from creating online digital content to creating a machine readable system for inputting cataloguing records on handwritten cards, to putting a World War II film project on line. Friedman has thus far been unable to demonstrate functionality, so that I can't at this time state, whether any of the infrastructure created through this project will in fact be viable.

"In my frustration with *Jim's lack of communication about this and other projects for the last two years, despite repeated verbal requests to be kept in the loop*, I asked him in early February to start copying me on all important emails with IBM, the Film Foundation, and other important outside vendors and commercial partners (dvd distributors etc.). He agreed and has since been copying me on highly technical emails, concerning the IT minutiae of the IBM Hearst project (which frankly I don't understand).

"Yesterday, through discussions with one of our most important donors, the Film Foundation, I found out that Mr. Friedman had taken a high level meeting three weeks ago with Bob Yacenda and representatives of the Film Foundation to discuss the Archive's born digital preservation efforts. I was never informed of the meeting, either before or after the meeting, and certainly not copied on any of the emails that must have been written to set up and discuss the meeting. Not only was I put in an embarrassing position with two important partners, but also feel that *Friedman may be actively undermining TFT's efforts* to communicate with IBM, because he believes he should be the only contact with them. Obviously, I can't prove this allegation, but given his attempt to keep IBM for himself, leads me to this suspicion.

"As if this *gross insubordination* were not enough, I was greeted a few days earlier with an email from Friedman to the whole Archive staff, announcing his success in negotiating a dvd deal with Criterion. Again, while Jim had informed me in a meeting months ago that he was talking to Criterion, I had neither seen nor approved nor signed 'the contract' with Criterion, nor did I approve him sending out the announcement. Again, I can't believe that this negotiation didn't occur via email, which – contrary to his promise – he never copied me on.

"There is a pattern here that I have not been able to break. It is now my opinion that he will never be a team player and that he may be *actively working against the interests of TFT*, especially in his handling of the IBM situation. I would therefore like to let him go and I think we can work with TFT's [Human Resources] representative to restructure his department to eliminate the position. Proving malfeasance is difficult, despite much written evidence, so I think a separation through restructuring is the way to go.

"My major concern is TFT's relationship with IBM. If we keep him, I suspect he will continue to undermine the School's efforts to develop a relationship with IBM. If we let him go, we may have to face some push back from Jim's 'friends' at IBM.

fact. We briefly consider several of the challenged statements in the e-mail. Friedman first contends that Horak accuses him of being the only staff member in the Archive who does not support the Dean's initiatives. But the e-mail immediately explains that this is simply Horak's "belie[f]," and sets forth the reasons giving rise to that belief. Thus, the statement can only be construed as opinion. Second, Friedman contends that Horak accuses him of intentionally undermining a co-worker's efforts with IBM. Yet, in the e-mail, Horak clearly prefaces his statement regarding such interference as merely "a plausible theory." The statement is not presented as fact. Third, Friedman contends Horak accuses him of "gross insubordination." But Horak's e-mail does not imply there are unspoken facts which support the charge; instead, Horak sets forth an incident in which Friedman took a "high level meeting" without Horak's knowledge, and refers to that act as gross insubordination. Friedman does not allege that he did not, in fact, attend the meeting without Horak's knowledge. Horak's inference that the act was "gross insubordination" is mere opinion. Fourth, Friedman contends that Horak accuses him of actively working against the interests of TFT. Horak's e-mail twice suggests that this is the case, but each time couches the allegation in the language of opinion – first stating that he "[o]bviously . . . can't prove this allegation," but it is his "suspicion"; and second, stating that it is his "opinion" that Friedman "may" be working against TFT's interests. Such language signals to any reasonable reader that the statements are mere opinion.

Other statements in the e-mail, however, are arguably not statements of opinion. Friedman alleges that Horak accuses him of "purposefully stonewalling Horak's requests for goals and deliverables over the life of the IBM project." The e-mail does state that Horak's requests for goals and deliverables from Friedman "have been stone-walled." Whether Horak has or has not requested goals and deliverables, and whether Friedman has or has not complied with those requests, are factual statements which could be proven false. Friedman contends Horak's e-mail accuses him of failing

---

"Sorry for the long explanation, but I will be happy for your guidance . . . ."

12

to communicate "despite repeated verbal requests." This, too, is a fact which could be proven false. It is therefore not a non-actionable opinion.

### 2. *Qedwai's E-mail to Human Resources*

After Friedman was laid off, he sent a letter to Associate Vice-Chancellor Lubbe Levin, complaining that his layoff had been unlawful. Thereafter, Levin contacted Toni Elboushi at Human Resources, seeking documentation regarding the basis for Friedman's layoff. Elboushi then sent Levin a lengthy email, based on information given to her by Qedwai.

According to Friedman, Qedwai had informed Elboushi that Friedman "refused to meet though he was requested to do so." Friedman contends that this statement was "blatantly false and outright malicious as Mr. Friedman had just e-mailed Mr. Qedwai and proposed a meeting time." Under the circumstances of an e-mail to Human Resources discussing Friedman's performance, Qedwai's alleged statement that Friedman refused to meet[6] is not mere opinion.

### 3. *Horak's May 18, 2010 Letter to Assistant Dean*

When Friedman challenged his layoff to Levin, he claimed that he was laid off for whistleblowing conduct. In the course of UCLA's investigation of these allegations, Horak wrote a letter to Assistant Dean Ollie Van Nostrand, responding to some of Friedman's specific allegations. In the letter, Horak allegedly stated that, in accusing

---

[6] Based on the entire record before this court, it is not at all certain that Qedwai made this statement. When Friedman raised this purported statement in opposition to the motion for summary adjudication, he supported it not with a reference to Qedwai's e-mail itself, but Elboushi's e-mail to Levin, purporting to convey Qedwai's statement. At no point in Levin's e-mail does she state that Qedwai stated Friedman unequivocally refused to meet; the e-mail instead sets forth a lengthy course of discussions between Qedwai and Friedman regarding the proposed meeting. However, we are not considering this purportedly defamatory statement in the context of a summary adjudication motion. In connection with the summary adjudication motion, the trial court rightly noted that this statement had not been mentioned in the operative pleading. Friedman then moved for leave to amend his complaint to allege it. In other words, we are concerned only with whether Friedman should have been permitted to amend his complaint to allege this statement, not with whether Friedman can prove that Qedwai made it.

13

Horak and Qedwai of illegal activities, Friedman was, in fact "trying to cover up his own financial improprieties." Whether Friedman was *actually* trying to "cover" anything up is simply a matter of Horak's opinion. However, the statement clearly implies knowledge of facts that Friedman has, indeed, committed specific financial improprieties. This statement is therefore not non-actionable opinion, and may be actionable.[7]

### c. *Conclusion Regarding Defamation*

In short, the trial court properly granted summary adjudication on Friedman's defamation cause of action, on the basis that the statements alleged in the operative complaint constituted non-actionable opinion. However, the trial court erred in denying leave to amend on the basis that all of the statements set forth in Friedman's proposed amended complaint also constituted non-actionable opinion. There were, however, other bases on which defendants had opposed Friedman's motion for leave to amend, which the trial court did not address. As such, we reverse the judgment in favor of Horak and Qedwai, with directions for the trial court to reconsider Friedman's motion for leave to amend his complaint.

### 2. *Judgment in Favor of the Regents*

In his appeal of the judgment in favor of the Regents, Friedman contends the trial court erred in three evidentiary rulings.

### a. *Exclusion of Evidence of Gender Discrimination of Which Friedman Did Not Complain*

Friedman's direct evidence of having opposed or complained of gender discrimination was weak. He did not complain in writing. He did not complain to

---

[7]     Again, the document in which the statement was purportedly made was not attached to the proposed third amended complaint. From our review of the entire record, we have seen the document in which the challenged statement appears. In the full context of this letter, and Friedman's letter to which it was responsive, it appears that Horak did not, in fact, baldly charge Friedman with accounting improprieties, leaving it to the reader to assume that a factual basis existed for the charge. Instead, Horak explained precisely the "improprieties" to which he is referring – improprieties which Friedman does not contest (although he believes they were unintentional).

14

anyone more senior than Horak, the individual he believed was committing the discriminatory acts. Nor did he clearly and unambiguously complain that Horak's conduct was discriminatory. Instead, Friedman took the position that he complained about discrimination by making two statements in meetings with Horak. First, in 2008, the working hours of three female employees were reduced, as a cost-saving measure, in order to avoid laying off any employees entirely. Friedman told Horak that it seemed "strange" that the time reductions affected three women in Qedwai's department, and that "it didn't look good." Second, later in 2008, another female employee retired, shortly after enduring a lengthy and difficult audit. Friedman told Horak there "had to be another way to handle" it, because she had retired unhappily. Friedman believed that something could have been done to retain this valuable female employee. Friedman did not contend he made any direct complaints of gender discrimination. Horak denied that Friedman made any complaints of gender discrimination at all.

Friedman sought to bolster the evidence that he complained about these two purported incidents of gender discrimination with evidence that other incidents of gender discrimination occurred. Friedman argued that he should be permitted to introduce evidence of these other incidents of discrimination, even though he concededly did not complain about them, in order to support his retaliation cause of action. Specifically, Friedman sought to introduce evidence that: (1) Qedwai made comments indicating that he did not believe women belonged in the workplace; and (2) Horak, in a meeting, described a particular female colleague as a "cunt." Friedman argued that this evidence was relevant on the basis that evidence of *other* acts of discrimination in the workplace made it more likely that Friedman would have complained about the two incidents about which he claims to have complained.

The Regents successfully moved to exclude this evidence by means of a motion in limine. The trial court granted the motion on the basis of Evidence Code section 352, that is, that the evidence was substantially more prejudicial than probative. Friedman challenges the ruling on appeal, arguing that Qedwai's and Horak's improper statements

15

provided a motive for Friedman to complain about the other acts of discrimination, and therefore corroborated Friedman's testimony that he did complain.

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's determination under Evidence Code section 352 will not be disturbed on appeal absent a clear showing of abuse of discretion. (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1610.) There is no abuse of discretion here. Indeed, we perceive no probative value to the evidence at all. The issue before the jury was whether Friedman did, in fact, complain of gender discrimination in the time reductions of three female employees and the retirement of a fourth; whether Qedwai and Horak had made other statements about which Friedman concededly did not complain has no tendency in reason to prove or disprove the key issue.[8] (Evid. Code § 210.) Moreover, even if there were some minimal probative value to the evidence Friedman sought to admit, it was clearly prejudicial. A supervisor using the word "cunt" in the workplace is extremely offensive;[9] there is a substantial risk that the jury would be so offended by Horak's purported use of the word that it would choose to rule against the Regents because of Horak's language alone, even though Horak's use of the word *indisputably* was not something Friedman complained about. Admitting Qedwai's statements would likewise have been prejudicial. Qedwai's attitude toward women in the workplace was simply

---

[8]    Friedman argues that these discriminatory statements provided Friedman with further motive to challenge the purportedly discriminatory reductions in wages and retirement. But if Friedman perceived these latter acts as discriminatory, he already had sufficient motive to report them. Similarly, if he was actually aware that Qedwai and Horak made discriminatory statements, this would have given him motive to report *those statements* as discriminatory. We fail to see how it would have given him further motive to complain of completely separate discriminatory acts.

[9]    Indeed, the word is so offensive that Friedman's counsel has chosen to avoid spelling it out in Friedman's briefs.

16

irrelevant to Friedman's layoff, and the danger that the jury would nonetheless penalize the Regents for Qedwai's statements was legitimate. The trial court therefore did not abuse its discretion in excluding the evidence.[10]

### b. *Exclusion of Evidence of Retaliation Against Others Who Had Complained of Gender Discrimination*

Friedman next contends the trial court erred in excluding so-called "me too" evidence – evidence of other employees, allegedly similarly situated to Friedman, who had been retaliated against for complaining of gender discrimination. "Me too" evidence is relevant in retaliation cases. (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 297.) "[I]f these other employees faced similar retaliation to that alleged by appellant . . . , it cannot be said that such evidence could be of no relevance to appellant's retaliation claim. If this 'me-too evidence' was probative of respondents' intent in retaliating against appellant, as alleged, it should have been admitted . . . . " (*Ibid.*)

Apart from whether the trial court erred in excluding the evidence, any such error could not be prejudicial as a matter of law. A judgment shall not be reversed by reason of the erroneous exclusion of evidence unless the error "resulted in a miscarriage of justice." (Evid. Code, § 354.) A miscarriage of justice exists only when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) In this case, the jury concluded that Friedman *did not* complain of gender discrimination. Therefore, the issue of whether his complaints were a motivating factor in the Regents' decision to lay him off – the only issue to which the "me too" evidence

---

[10]     Friedman also argues that he sought to use the evidence for impeachment, as, at his deposition, Horak denied having using the word "cunt." Friedman believed this was false, as he had a witness who submitted a declaration that she had not only heard Horak use the word, but had complained to the then-dean of TFT about it. Evidence Code section 352 supports the trial court's exclusion of the evidence on this theory as well. This would clearly constitute impeachment on a collateral matter, and bringing in an additional witness in order to have a mini-trial on the issue of whether Horak had ever used the word would necessitate an undue consumption of time.

17

would have been relevant – was not reached. Thus, had the evidence been admitted, it could not have changed the result. Any error in excluding the evidence was therefore not prejudicial.

        c.     *Admission of a Document Reflecting Income*
             *Generated by the Archive*

Friedman's unit in the Archive was responsible for "Commercial Services," that is, generating revenue for the Archive through, among other thing, licensing footage owned by the Archive. After restructuring, the generation of revenue through licensing was handled by the "Media Licensing" unit.

Horak testified that one reason he restructured away Friedman's position was that Commercial Services was not generating as much income as it previously had. This was not a specific criticism of Friedman's work, but a belief that the market for licensing film clips and selling DVDs was drying up in the digital age. In order to demonstrate that Commercial Services was not, in fact, generating income at the same levels as previous years, the Regents introduced into evidence Exhibit 418, a two-page chart setting forth the "Media Licensing Sales & Services (income details)" for four fiscal years, ranging from the fiscal year ending in 2008 to the fiscal year ending in 2011. The chart listed income in various categories (the largest such category was "Licensing fee," although it also included such minor line items as administrative costs and the cost of blank media), and reached totals for each fiscal year. Qedwai's testimony focused on the totals. In the fiscal year ending in 2008, the total was $607,016.01; in the fiscal year ending in 2009, the total dropped to $443,082.35; in the fiscal year ending in 2010, the total dropped further to $423,585.48; and in the fiscal year ending in 2011, the total increased modestly to $450,307.83.[11]

---

[11]    Qedwai concluded from these figures that, after Friedman was laid off, the total income increased. Friedman cross-examined Qedwai on this point, eliciting testimony that some of the income the Archive received in fiscal year 2010-2011 was due to work that Friedman had performed during his employment. In any event, it is undisputed that whether the licensing income increased or decreased after Friedman was laid off could not possibly have been relevant to the decision to lay him off. The Regents introduced

Exhibit 418 was admitted over Friedman's hearsay objection, as a business record. On appeal, Friedman contends this was error, as the document, having been prepared solely for litigation, did not constitute a business record. Apart from whether the trial court erred in admitting the exhibit, we conclude that Friedman has failed to establish that any error in its admission was prejudicial. (See Evid. Code, § 353 [A judgment shall not be reversed by reason of the erroneous admission of evidence unless the error "resulted in a miscarriage of justice."]) There are multiple reasons why this is so.

First, on appeal, Friedman did not timely argue that the error was prejudicial. In his opening brief, he argued only that the document was not admissible. After the Regents pointed out Friedman's failure to argue prejudice, Friedman made a brief argument that the admission of the evidence was prejudicial. But arguments raised for the first time in a reply brief will ordinarily not be considered. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

Second, to the extent Friedman belatedly argues prejudice, he argues that the evidence was prejudicial in that it supported the Regents' arguments that he was laid off as a result of restructuring, rather than for improper reasons. As the jury concluded that Friedman did not complain about gender discrimination (and the layoff therefore could not possibly have been retaliatory), the only issue to which Exhibit 418 could have been relevant was whether Friedman's age was a motivating factor in his layoff. In arguing that Exhibit 418 was prejudicial on this issue, Friedman relies on the implied premise that, in the absence of Exhibit 418, there was no evidence of declining profits in Commercial Services. Such argument cannot succeed because Friedman has failed to provide the entire record on appeal. Over 150 exhibits were introduced into evidence at the trial; Friedman has provided this court with 9 of them. Even considering the additional six exhibits supplied by the Regents in their respondents' appendix, we do

Exhibit 418 *not* to establish that the total income increased somewhat after Friedman's departure, but to establish that income had decreased dramatically *prior to* his layoff.

19

not have all of the evidence at trial before us.  It is the appellant's burden to provide an adequate record on appeal.  (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.)

Third, there is certainly reason to believe that, had we been provided with the entirety of the exhibits, they would undermine Friedman's prejudice argument. Friedman himself authenticated Exhibit 4, a set of financial numbers Friedman provided at Horak's request for the preparation of a "strategic plan."  Exhibit 4 is not part of the record on appeal.  However, the record before this court includes several pages of a draft of the strategic plan, submitted by the Regents in connection with their motion for summary judgment, which sets forth the "Planned" and "Actual" income for Commercial Services for several years, indicating the income for fiscal year 2008 was $607,016 and the income for fiscal year 2009 was $443,082 – the same numbers listed in Exhibit 418 for those years.

Fourth, the fact that two of the Exhibit 418 totals appear in the draft strategic plan establishes that, even if those numbers were not before the jury in other exhibits, the substantial drop in income demonstrated by the exhibit was supportable by other evidence.  In other words, had Exhibit 418 been excluded from evidence, the 27% decline in income generated by Commercial Services from fiscal year 2008 to fiscal year 2009 could have been established by other evidence.

Fifth, the decline in income of Commercial Services in general, and Exhibit 418 in particular, were a very minor part of the Regents' case with respect to age discrimination.  The issue before the jury was a simple one:  was Friedman's age a motivating factor in his layoff, or was he laid off solely due to restructuring and insubordination?  Numerous witnesses testified on the issue.  Friedman presented a case that Horak had a history of eliminating older employees and replacing them with younger employees.  The Regents responded with evidence that:  (1) restructuring Friedman's position away was long-contemplated as a cost-saving measure, and advanced in time due to his insubordination;  (2) many of the older employees who were replaced with younger employees had simply retired or chosen to leave;  and (3) Horak himself was 61 years of age.  Either the jury would believe the Regents'

witnesses or it would conclude the Regents' purported reasons were a pretext for age discrimination. The effect of a document setting forth four years of income in a chart, admittedly generated for trial (and not, therefore, relied upon at the time of the layoff) was minimal at best. Exhibit 418 was no "smoking gun" exhibit. Whether income generated by Commercial Services had decreased was a very small part of the Regents' case. Indeed, although Friedman's counsel's argument to the jury attempted to address (and undermine) all reasons raised by the Regents to justify Friedman's layoff, Friedman's counsel never addressed Exhibit 418 and the argument that Commercial Services was losing money. In short, we simply cannot conclude that, in the absence of Exhibit 418, it is probable that the jury would have concluded age was a motivating factor in Friedman's layoff. Any error was therefore not prejudicial.

## *DISPOSITION*

The judgment in favor of the Regents is affirmed. The Regents shall recover their costs on appeal from Friedman. The judgment in favor of Horak and Qedwai is reversed. The matter is remanded for further proceedings on Friedman's motion to amend his complaint. As to the appeal from the judgment in favor of Horak and Qedwai, the parties shall bear their own costs.


### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*



EDMON, J.[*]

WE CONCUR:




KITCHING, Acting P. J.




ALDRICH, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.