Filed 7/24/15  LifeVantage Corp. v. MacFarland CA1/15
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **LIFEVANTAGE CORPORATION,**     **Plaintiff and Respondent,**  v.  **BRIAN C. MACFARLAND,**     **Defendant and Appellant.** | **A141057**  **(San Mateo County Super. Ct. No. CIV521137**) |

Appellant Brian C. MacFarland posted a number of articles online that were highly critical of a product made by respondent LifeVantage Corporation (LifeVantage). After MacFarland made a number of claims about the development, effectiveness, and marketing of LifeVantage's product, LifeVantage sued him for libel.  MacFarland responded by filing a special motion to strike under Code of Civil Procedure section 425.16 (section 425.16).[1]  The trial court denied the motion, and MacFarland now appeals.

MacFarland argues his statements about LifeVantage were mere expressions of opinion and contain no provably false assertions of fact.  Thus, he contends he cannot be held liable for defamation.  We disagree.  "While many Internet critiques are nothing more than ranting opinions that cannot be taken seriously, Internet commentary does not ipso facto get a free pass under defamation law."  (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 422 (*Bently Reserve*).)  Where, as here, an Internet

[1] All further undesignated statutory references are to the Code of Civil Procedure.

1

commenter affirmatively represents he is stating facts and not opinions, a reasonable reader might well conclude his statements are intended to be factual. In addition, contrary to MacFarland's contentions, we conclude LifeVantage is not a limited purpose public figure. Finally, we reject MacFarland's argument that LifeVantage failed to show it is entitled to any remedy. Accordingly, we will affirm the order from which the appeal is taken.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the complaint, declarations, and evidence submitted in connection with the special motion to strike. (See § 425.16, subd. (b)(2); *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1175.) In accordance with our standard of review of orders denying such motions, our statement of facts accepts as true the evidence favorable to LifeVantage. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis Realty*).)

*LifeVantage and the Development of Protandim*

LifeVantage is a Colorado corporation that makes Protandim®, a patented dietary supplement it sells to independent distributors. According to LifeVantage, blood tests on human subjects in a clinical trial show Protandim reduces "oxidative stress" in the body.[2]

In early 2004, Paul Myhill and William Driscoll contacted Dr. Joe M. McCord, a biochemist at the University of Colorado Medical School, and asked him to develop a nutritional supplement that would increase the level of certain antioxidant enzymes in the body. Dr. McCord was primarily responsible for the development and initial laboratory testing of Protandim. He has also served as LifeVantage's chief science officer, as chair of the company's scientific advisory board, and as a member of its board of directors.

To develop Protandim, Dr. McCord took certain antioxidant ingredients from a list Myhill had proposed and tested them on mice. He then conducted a human clinical trial. The trial was a success, and the results were published in a peer-reviewed journal. Studies of Protandim have been funded by the American Heart Association (AHA), the

---

[2] Oxidative stress is a biochemical process that damages cells in the body. It is associated with the aging process and development of various diseases.

2

National Institutes of Health (NIH), and the Defense Advanced Research Projects Agency (DARPA) of the United States Department of Defense. Other studies have verified Protandim's effects and have also been published in peer-reviewed journals. The Interventions Testing Program of NIH's National Institute on Aging accepted a proposal co-authored by Dr. McCord to conduct a study of the effects of Protandim on mice.

Eric E. Marchant, LifeVantage's Vice President of Compliance filed a declaration stating that LifeVantage promulgates and enforces detailed policies and procedures to ensure statements about Protandim are accurate and compliant with applicable regulations. Protandim is a patented dietary supplement; it is not a drug. Thus, in accordance with federal Food and Drug Administration regulations, LifeVantage instructs distributors that product claims about Protandim must include a disclaimer stating that Protandim is not "intended to diagnose, treat, cure or prevent any disease." LifeVantage trains the independent distributors of Protandim in matters of regulatory compliance and requires compliance as a condition of their distribution contracts. The company warns, suspends, and terminates distributors for violations.

*MacFarland's Websites and the Statements at Issue*

MacFarland is a software engineer who runs the "Lazy Man and Money" website (www.lazymanandmoney.com), which he calls "my personal journal where I explore how I can save money and make more money." He is also the author of a post that was called "Exposing the Protandim Scam" at the time of suit, (later changed to "Protandim Scams Exposed!"), and is the operator of the site www.protandimscams.com (collectively, the Websites). MacFarland moderates the comments sections of the Websites and engages in debate in the comments, often under the screen name "Lazy Man."

On the Websites, MacFarland made a number of statements about LifeVantage and the research and development of Protandim. He claimed Protandim was "something that Paul Myhill put together in his kitchen with no lab research at all." MacFarland also claimed LifeVantage had "fudged" the studies on Protandim, and he said there was "evidence of data rigging in the Protandim human clinical trial." According to

3

MacFarland, the claim that Protandim "reduc[es] oxidative stress by 40% is not proven either . . . [LifeVantage] came up with that in what appears to be a fudged and flawed experiment . . . ."

MacFarland also claimed LifeVantage and Dr. McCord had manipulated the process of getting the Protandim studies published. He told readers LifeVantage had "used [its] connection with Dr. Joe McCord to get studies involving Protandim published in journals." In a post entitled, "The Lies Behind the Protandim FAQ," MacFarland averred, "[LifeVantage] hired Dr. Joe McCord who was on the board of directors of Free Radical Biology, so he could get [its] studies published there." He further claimed Dr. McCord's position "on the board of a journal with a number of published studies" meant "that he [McCord] can [give] rubber stamp approval for such articles." MacFarland repeatedly accused Dr. McCord of lying about Protandim and said McCord's friends and colleagues might be doing Protandim studies "as a favor" to him. In a related assertion, MacFarland said it was obvious LifeVantage was using the studies for marketing because the company had issued a press release claiming AHA and NIH had funded studies on Protandim "when neither organization had knowledge that its donated funds were to be used for the purpose of studying Protandim."

MacFarland's posts also claimed LifeVantage was actively encouraging distributors of Protandim to make illegal claims about the product. Responding to a comment from a reader, MacFarland said LifeVantage was "encouraging distributors to make . . . illegal claims because it boosts sales." He went further, telling another commenter that "[Protandim] distributors are coached by LifeVantage to make these illegal claims as part of their sales pitch." MacFarland also said LifeVantage was not educating its distributors to avoid making "illegal claims . . . that would hurt their sales."

MacFarland repeatedly portrayed his statements as ones of fact. After a commenter suggested MacFarland was entitled to his opinion but "[f]acts will hold up a lot stronger[,]" MacFarland responded, "That's why this article and the comments [are] full of facts and not opinions." In discussing his detractors, MacFarland said "the points that I made in the article are correct and defensible." He claimed his statements about Dr.

4

McCord using his influence to get Protandim studies published were not merely his " 'belief.' This is a fact of how the system actually works." MacFarland claimed to have created the site "to spread truth about [LifeVantage] and the product." He told commenters, "Everything is well sourced showing that it isn't made up and [is] truthful and factual." Addressing LifeVantage specifically, MacFarland said, "LifeVantage says that these articles represent, 'knowingly false statements of fact.' However, the statements are true!"

*LifeVantage's Action*

On April 12, 2013, LifeVantage filed a complaint against MacFarland alleging causes of action for libel and libel per se. MacFarland responded by filing a demurrer and a special motion to strike under section 425.16.**³** In support of these motions, MacFarland asked the trial court to take judicial notice of over 300 pages of material.

The trial court overruled MacFarland's demurrer and denied the special motion to strike, ruling that a declaration submitted by Dr. McCord supported LifeVantage's contention that several of MacFarland's statements were defamatory and that other declarations supplied evidence of LifeVantage's damages. The court concluded the declarations LifeVantage submitted "adequately demonstrated that [MacFarland] published defamatory statements of fact about [LifeVantage], and that [LifeVantage] suffered damages as a result of [MacFarland's] statements."

MacFarland filed a notice of appeal from the denial of his special motion to strike. On June 18, 2014, he filed a motion for judicial notice in this court, asking that we take judicial notice of the documents he had unsuccessfully presented to the trial court for the same purpose.

---

**³** Many of the arguments MacFarland presents on appeal were made as part of his opposition to the demurrer rather than as part of his opposition to the motion to strike. LifeVantage does not contend we should not consider the arguments made in connection with the demurrer as part of the appeal from the denial of MacFarland's motion to strike. (Cf. *Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306, 314, fn. 4 [court would not address demurrers because only order denying special motion to strike was appealable].)

DISCUSSION

MacFarland challenges the trial court's order denying his motion to strike on a number of grounds. He first contends his statements were nonactionable, protected expressions of opinion rather than provably false assertions of fact. He also argues LifeVantage failed to submit prima facie evidence to substantiate its claims. Finally, MacFarland contends LifeVantage has failed to show it is entitled to any remedy.

Before we address these contentions, we will first explain our standard of review. Next, we will resolve the issue of judicial notice, since it affects the record upon which we base our decision. We will then turn to the merits.

I.      *Special Motions to Strike and Standard of Review*

An order denying a special motion to strike under section 425.16 is appealable. (§ 425.16, subd. (i).) "Resolving the merits of a section 425.16 motion involves a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if it does, proceeding secondly to whether the plaintiff can establish a probability of prevailing on the merits." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699 (*Overstock.com*).) "In this case, 'we bypass the initial inquiry because everyone agrees that the first hurdle in obtaining anti-SLAPP relief has been met' . . . and, indeed, the libel claim undoubtedly arises from protected activity. We therefore focus solely on the second prong—whether plaintiff[] carried [its] burden of showing a probability of prevailing on the merits of [its] libel claim. [Citation.]" (*Bently Reserve*, *supra*, 218 Cal.App.4th at p. 425.)

"In this regard, our review is de novo. [Citations.] We apply a 'summary-judgment-like' test [citation], accepting as true the evidence favorable to the plaintiff and evaluating the defendant's evidence only to determine whether it defeats the plaintiff's evidence as a matter of law [citations]. The evidence put forward at this stage must be admissible; even allegations in a verified complaint are insufficient. [Citation.]" (*Bently Reserve, supra,* 218 Cal.App.4th at pp. 425-426.)

"To satisfy the second prong, 'a plaintiff responding to an anti-SLAPP motion must " 'state[] and substantiate[] a legally sufficient claim.' " [Citation.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citation.] 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." [Citation.] However, we neither "weigh credibility, [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' [Citation.] If the plaintiff 'can show a probability of prevailing on *any part of its claim,* the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.' [Citation.]" (*Oasis Realty, supra,* 51 Cal.4th at p. 820.)

Thus, "[w]hen a cause of action states multiple grounds for relief, 'the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any' one of those grounds." (*Bently Reserve, supra,* 218 Cal.App.4th at p. 426.) Only causes of action that lack " 'even minimal merit' " constitute a SLAPP. (*Overstock.com, supra,* 151 Cal.App.4th at p. 700.) " 'In addition to considering the substantive merits of the plaintiff's claims,' the court 'must also consider all available defenses to the claims. . . .' " (*Bently Reserve, supra,* 218 Cal.App.4th at p. 426.)

II.     *Judicial Notice*

MacFarland contends the trial court erred in refusing to take judicial notice of many of the documents he submitted in support of his motion to strike. In addition to claiming the trial court erred, he asks us to take judicial notice of the documents in the first instance. As we explain, we conclude the trial court did not err, because MacFarland failed to meet his burden of showing why judicial notice was appropriate. We also deny the motion for judicial notice he has addressed to us.

7

A. *The Trial Court Did Not Abuse its Discretion in Denying in Part MacFarland's Request for Judicial Notice.*

MacFarland contends the trial court erred in denying his request for judicial notice of additional pages of the Websites and pages to which he hyperlinked. He argues these are necessary to provide the full context of the allegedly defamatory statements. His opening brief asserts the trial court should have taken mandatory judicial notice of this context. We find no error.

We must first determine the applicable standard of appellate review. MacFarland asks us to review the trial court's ruling de novo, but this is not the proper standard. " '[T]he decision of the judge not to take judicial notice will be upheld on appeal unless the reviewing court determines that the party furnished information to the judge that was so persuasive that no reasonable judge would have refused to take judicial notice of the matter.' "[4] (*Willis v. State of California* (1994) 22 Cal.App.4th 287, 291.) We therefore review the court's ruling only for abuse of discretion. (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264 (*Fontenot*).)

In the trial court, MacFarland sought judicial notice of these materials pursuant to Evidence Code sections 451, subdivisions (e) and (f) and 452, subdivisions (g) and (h).[5]

---

[4] MacFarland's reliance on *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 (*Reid*), is misplaced. In that case the California Supreme Court declined to decide whether a trial court's rulings on evidentiary objections based on papers alone should be reviewed for abuse of discretion or reviewed de novo. (*Id.* at p. 535.) Here, we are not confronted with evidentiary objections on which the trial court failed to rule specifically (see *id.* at p. 533), but rather with a request for judicial notice that the trial court granted in part and denied in part by written order. In fact, in his request for judicial notice in this court, MacFarland admits the trial court expressly ruled on the requests. Thus, unlike *Reid,* this is not a case in which "there was no exercise of trial court discretion[.]" (*Ibid.*)

[5] Evidence Code section 451, subdivisions (e) and (f) provide that judicial notice *shall* be taken of: "(e) The true signification of all English words and phrases and of all legal expressions. [¶] (f) Facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute."

Evidence Code section 452, subdivisions (g) and (h) provide that judicial notice *may* be taken of: "(g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute. [¶] (h) Facts and propositions that are not reasonably subject to dispute and are

But the request did not explain to the trial court how the materials for which judicial notice was sought met the criteria set forth in the cited sections of the Evidence Code. Instead, MacFarland simply asked the court to take judicial notice of nearly 400 pages of attached documents, many of which were printouts of various Web pages. Rather than make a showing that either mandatory or discretionary judicial notice was appropriate with respect to each of the materials, he asked the trial court to take judicial notice of them en masse.

"The burden is on the party seeking judicial notice to provide sufficient information to allow the court to take judicial notice." (*Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 744.) MacFarland failed to meet his burden. He sought judicial notice of particular facts by placing hundreds of pages of documents before the trial court but without showing how each of the materials was relevant to the issues before the court. (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 (*Mangini*) [judicial notice is always confined to matters that are relevant to issue at hand].) He also failed to demonstrate that the materials satisfied the criteria of the provisions of the Evidence Code on which he relied, and the trial court could properly deny the requests on that basis. (*Creed-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 520-521 [affirming denial of request for judicial notice where party failed to satisfy requirements of Evid. Code, § 453].) The trial court nevertheless granted MacFarland's request in part. He could have "presented a more narrowly tailored request" but did not do so. (*Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 856 [denying request for judicial notice that was "grossly overbroad"].) In these circumstances, we cannot conclude the trial court abused its discretion.

B.      *We Deny MacFarland's Motion for Judicial Notice.*

Having failed to persuade the trial court to take judicial notice, MacFarland has filed a motion in this court seeking judicial notice of the same materials. His principal argument is that the materials are necessary to understand fully the context of the

capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

9

allegedly defamatory statements and to determine whether the statements would reasonably be interpreted to have the defamatory meaning LifeVantage ascribes to them. He also claims the materials are relevant to identifying the matters put in issue by the complaint. MacFarland argues the materials are offered only to prove certain statements were made and not for the truth of the statements themselves. Specifically, MacFarland contends the materials are judicially noticeable to show the manner in which the exhibits for which notice is sought are hyperlinked with each other and to show that certain comments set forth in the complaint are responsive to other comments. The sole statutory basis cited in the motion is Evidence Code section 452, subdivision (h).**6**

Since MacFarland relies on Evidence Code section 452, subdivision (h) as the basis of his request, he must show the facts for which judicial notice is sought are not reasonably subject to dispute. (See *Fontenot, supra,* 198 Cal.App.4th at p. 266.) The facts must also be "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) Neither the World Wide Web nor the Internet necessarily qualify as such sources. (See *People v. Franzen* (2012) 210 Cal.App.4th 1193, 1211, fn. omitted ["It is common knowledge by now that the World Wide Web, and more generally the Internet, provides ready access to information of all shades and degrees of accuracy, from the indisputably true to the inarguably false."].)

We therefore deny MacFarland's motion for judicial notice.

---

**6** Citing *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, MacFarland appears to argue judicial notice was mandatory. In that case, the California Supreme Court took compulsory judicial notice of a copy of one week's *New York Times* best seller list. (*Id.* at pp. 1037, 1046, fn. 2.) *Blatty* did not consider whether compulsory judicial notice would have been appropriate if there had been a dispute about the authenticity of the list. Evidence Code section 452, subdivision (h), upon which *Blatty* relied, permits judicial notice only of facts "not reasonably subject to dispute and . . . capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." As we will show, those criteria are not met here.

10

III.     *MacFarland's Statements Could Reasonably Be Construed as Statements of Fact Rather than as Expressions of Opinion.*

MacFarland argues the challenged statements constituted opinions protected by the First Amendment rather than provably false assertions of fact. He contends statements are not assertions of fact if they are not susceptible to being proved true or false. In his view, the complaint fails to show he made any provably false factual assertions. Although LifeVantage may satisfy the second prong of the anti-SLAPP analysis by showing a probability of prevailing on any one of the grounds for relief, we must consider all available defenses to the claims, including constitutional defenses. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 426; *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1026.) We therefore examine McFarland's contentions in some detail after we set forth the principles of the law of defamation that guide our decision.

A.     *Governing Law – Defamation*

To be libelous, a statement must contain a provable falsehood. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 426.) Thus, for purposes of defamation liability, courts distinguish between statements of fact and statements of opinion. (*Ibid*.) Statements of opinion do not enjoy blanket protection, however. (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696 (*Summit Bank*).) "On the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. [Citation.] The 'crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. [Citation.]' [Citation.] 'Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]' [Citation.] The question is ' "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. . . ." [Citation.] [Citation.]' " (*Ibid*.) "[I]f a statement is 'ambiguous and cannot be characterized as factual or nonfactual as a matter of law,' a jury must

11

determine whether the statement contains an actionable assertion of fact." (*Bently Reserve, supra,* 218 Cal.App.4th at p. 427.)

Courts apply a totality of the circumstances test in determining whether a statement is actionable fact or nonactionable opinion. (*Summit Bank, supra,* 209 Cal.App.4th at p. 696.) This requires an examination of both the statements themselves and the context in which they were made. (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 384.) A statement of purported opinion may be actionable if it implies the allegation of undisclosed defamatory facts as the basis of the opinion. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 902-903.) "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications[.]" (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18-19.)

"On the issue of context, our Supreme Court has explained: '[W]here potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.' [Citation.]" (*Summit Bank, supra,* 206 Cal.App.4th at p. 696.) " ' "Thus, "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. [Citations.]' [Citation.]' [Citation.]" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 289.)

Courts have recognized that the nature of online media may encourage participants to play fast and loose with facts, and thus visitors to websites will often discount a poster's statements accordingly. (*Summit Bank, supra,* 206 Cal.App.4th at pp. 696-697; see *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1149 [statements were "made on Internet Web sites which plainly invited the sort of exaggerated and insulting criticisms of businesses and individuals which occurred here"].) But this does not mean "online commentators are immune from defamation liability." (*Sanders v. Walsh* (2013) 219

12

Cal.App.4th 855, 864.) To the contrary, "Internet posts, where the 'tone and content is serious,' where the poster represents himself as 'unbiased' and 'having specialized knowledge,' or where the poster claims his posts are 'Research Reports' or 'bulletins' or 'alerts,' may indeed be reasonably perceived as containing actionable assertions of fact. [Citation.] And while 'generalized' comments on the Internet that 'lack any specificity as to the time or place of' alleged conduct may be a 'further signal to the reader there is no factual basis for the accusations,' specifics, if given, may signal the opposite and render an Internet posting actionable." (*Bently Reserve, supra,* 218 Cal.App.4th at p. 431; see also *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 904, fn. omitted [defendant's position as "crusader and watchdog to the industry" demonstrated she "expected readers to rely on her opinions as reflecting the truth"].)

B.    *MacFarland's Statements – Fact versus Opinion*

At the outset, MacFarland's claim that his statements are merely opinions is difficult to square with his repeated assertions on the Websites that his statements were *not* opinion but fact. As set forth above, MacFarland's stated purpose in creating the Websites was "to spread *truth* about [LifeVantage] and the product." (Italics added.) He told his readers his postings were "full of facts and not opinions." He denied his claim about Dr. McCord's alleged improper use of his position to get Protandim studies published was only his belief and asserted it was fact. He assured commenters that the material he posted was "truthful and factual."

Consequently, here "we are not confronted with vague implications of fact but with specific factual claims." (*Sanders v. Walsh, supra,* 219 Cal.App.4th at p. 864 [online post that prefaced many paragraphs with " 'Fact:' " and "recited alleged historical facts detailing perjury and fraud" held to contain statements of fact and not opinion].) MacFarland repeatedly claimed to his readers that he was reporting the truth and stating facts as opposed to opinions. He also asserted his statements were based on careful research and were well sourced. (See *Overstock.com, supra,* 151 Cal.App.4th at p. 706 [where defendant held itself out as having specialized knowledge, this tended to show statements were assertions of fact not opinion]; *Metaleuca, Inc. v. Clark*

13

(1998) 66 Cal.App.4th 1344, 1355 [references to research and case studies suggested factual basis for statements].)  In these circumstances, it is difficult to accept his argument that his statements are nonactionable opinion because "[t]hey are not phrased as mere impressions." (*Hawran v. Hixson*, *supra*, 209 Cal.App.4th at p. 291.)

      C.     *The Words "Scam" and "Fraud" May Be Construed as Statements of Fact.*

MacFarland contends words like "scam" and "fraud" are simply too vague to be considered assertions of fact.  To the extent MacFarland asks us to hold, as a matter of law, that these terms can *never* be considered assertions of fact, we decline to do so.  Clearly, allegations that LifeVantage engaged in unethical business practices could, in proper circumstances, support a claim for defamation.  (E.g., *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pp. 902-903 [defendant's allegations of plaintiff's unethical business practices were proper basis for defamation claim].)  And at least one California court has held that accusations of fraud by a defendant, even when made in an online forum, may constitute provably false statements of historical fact where the author claims the statements are factual.  (*Sanders v. Walsh, supra,* 219 Cal.App.4th at p. 864.)  As noted in our statement of facts, MacFarland represented that his assertions were facts, not opinions.  He maintained he was "getting the truth out there."  Where the speaker expressly claims his statements are fact and specifically denies they are opinions, we cannot say words like "scam" and "fraud" could not reasonably be construed as declaring or implying provably false statements of fact.[7]  (See *Good Government Group of Seal*

---

[7] MacFarland relies on cases from other jurisdictions to argue that characterizations such as "scam" or "fraud" are too imprecise to be proven true or false.  (See, e.g., *McCabe v. Rattiner* (1st Cir. 1987) 814 F.2d 839, 842.)  We acknowledge this case law, but we note numerous other courts have held these same terms *are* susceptible of defamatory meaning and capable of being identified as true or false.  (*JTH Tax, Inc. v. Grabert* (E.D. Va. 2014) 8 F.Supp.3d 731, 741 [assertion that business's system is " 'a scam, a scheme, a con' " constitute defamation per se; Virginia law]; *Corporate Training v. National Broadcasting Co.* (E.D.N.Y. 1994) 868 F.Supp. 501, 507-508 & fn. 3 [rejecting claim that statement involving "movie scam" was necessarily devoid of defamatory meaning; New York law]; *Sunshine Sportswear & Electronics v. WSOC Tele.* (D.S.C. 1989) 738 F.Supp. 1499, 1506 [terms "scam" and "rip-off" have ascertainable meaning and can be identified as either true or false]; *Kolegas v. Heftel Broadcasting Corp.* (1992) 154 Ill.2d

*Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 682 [where allegedly libelous remarks could be understood by average reader as fact or opinion, "the issue must be left to the jury's determination"].)

D.    *"Lies" About the Creation of Protandim*

MacFarland also argues his claims that LifeVantage lied about Protandim's creation by Dr. McCord are all based on facts disclosed and documented by Myhill, whose statements and documents were disclosed. Thus, he contends readers can judge for themselves whether his conclusion that the company "lied" is justified. But this section of MacFarland's opening brief does not direct us to the portions of the record showing he disclosed facts to support his assertion LifeVantage had lied. We would therefore be justified in treating this argument as forfeited. (*Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248, 1265, 1268; see *Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720, 741 ["Any reference in an appellate brief to matter in the record must be supported by a citation to the volume and page number of the record where that matter may be found. (Cal. Rules of Court, rule 8.204(a)(1)(C).) This rule applies to matter referenced at any point in the brief, not just in the statement of facts."].)

Even if the argument is not forfeited, it is unavailing. We assume this contention is based on MacFarland's posts, which he describes in a portion of the statement of facts in his opening brief discussing the creation of Protandim. (See *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1170-1171.) If this is correct, we note LifeVantage's complaint refers to two statements (among others) about Dr. McCord's role in Protandim's development that LifeVantage asserts are false. MacFarland wrote that Dr. McCord "didn't have anything to do with the product" and did not "influence[] the product *in [any way]*."

---

1, 11-12, 607 N.E.2d 201, 207 [statement that producer of festival was "scamming" people could be found defamatory per se]; *Cuba's United Ready Mix v. Bock Concrete* (Mo. Ct. App. 1990) 785 S.W.2d 649, 650, 651 [statement that materials supplier was "delivering inferior material" and "part of the fraud" held actionable as injurious falsehood].) While these cases are not binding on us, they demonstrate the words "scam" and "fraud" are not, as MacFarland suggests, so lacking in ascertainable meaning they could never be construed as assertions of fact.

15

(Italics added.) He also maintained, "People buying Protandim are just buying something that Paul Myhill put together in his kitchen *with no lab research at all.*" (Italics added.)

These statements are absolute. They assert Dr. McCord had nothing to do with Protandim or its development and that Myhill created the supplement without any laboratory research. The statements are certainly capable of being proven true or false. Either Dr. McCord was involved in the product's development or he was not. Either Protandim was developed after laboratory research or it was not. On these issues, Dr. McCord's declaration directly contradicts MacFarland's claims. MacFarland claimed LifeVantage lied about the creation of Protandim. "Calling someone a liar can convey a factual imputation of specific dishonest conduct capable of being proved false . . . and may be actionable depending on the tenor and context of the statement." (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 346.) Here, the specific conduct underlying MacFarland's assertions is capable of being proved false, and LifeVantage has put forth sufficient evidence to satisfy its minimal burden of showing probable merit. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 435.) That MacFarland offered a reader his factual sources "that were disclosed and documented by Myhill, which statements and documents [MacFarland] disclosed" –here that McCord was not the product's creator— does not avoid the inference that MacFarland made a factual statement that was false.

E.     *"Fudged" Studies and "Rigged" Data*

MacFarland argues his "views on the value and credibility" of critiques of LifeVantage's studies on Protandim are "inherently matters of opinion." According to MacFarland, the statements on the Websites that the data in the 2006 clinical trial was "rigged" or "fudged" are "expressly speculation based on certain disclosed facts[.]" These arguments miss the mark.

The statements about which LifeVantage complains are not expressions of opinion on the weight or value of the scientific evidence. Instead, they are assertions about LifeVantage falsifying studies related to Protandim, and indeed claiming LifeVantage did no research at all. Thus, MacFarland claimed to have "show[n] [in] the article, there's significant evidence LifeVantage fudged the labs" and told a commenter there was

16

"evidence of data rigging in the Protandim human clinical trial[.]" He claimed Protandim was "something that Paul Myhill put together in his kitchen with no lab research at all." These are not arguments over the conclusions to be drawn from data. They are statements declaring that LifeVantage either falsified data or failed to do any research on the product at all. They are therefore properly characterized as statements of purported fact.[8] (See *Melaleuca, Inc. v. Clark, supra,* 66 Cal.App.4th at pp. 1354-1355 [author's claims about what her research showed about chemical content of products were statements of fact, not opinion].) Such statements could reasonably be construed as defamatory. (See *Flowers v. Carville* (9th Cir. 2002) 310 F.3d 1118, 1127-1128 [statements that audio tapes had been 'doctored' or 'selectively edited' could reasonably be construed as defamatory].)

Dr. McCord's declaration contradicts MacFarland's assertions about the research. He avers he tested Protandim's ingredients in both mice and humans. His declaration disputes MacFarland's claims of fudged or rigged data, noting that the protocols for the human trials of Protandim were submitted to and approved by the Institutional Review Board of the University of Colorado Denver and the trials measured blood test results, an objective indicator. Again, this evidence satisfies LifeVantage's burden of showing the probable merit of its claims. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 435.)

---

[8] MacFarland's reliance on *Dong v. Board of Trustees* (1987) 191 Cal.App.3d 1572 is misplaced. In that case, the court held certain statements about the plaintiff's research were nonactionable opinion, but there, the plaintiff did not argue that the defendant had "misrepresented the medical data which led him to his 'belief.' " (*Id.* at p. 1586.) The same is obviously not true here. Equally misplaced is his reliance on *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322 (*Bernardo*). That case considered whether statements regarding abortion were commercial speech actionable under Business and Professions Code sections 17200 and 17500. (*Id.* at p. 343.) Unlike this case, the statements at issue in *Bernardo* consisted of an organization's commentary on published research about the safety of abortion. (*Id.* at p. 350.) Here, the issue is not differing opinions on whether the research supports LifeVantage's claims about Protandim; it is the truth or falsity of MacFarland's claims that LifeVantage either falsified the research or conducted no research at all.

17

F.      *Coaching Distributors to Make Illegal Product Claims*

In its complaint, LifeVantage alleged MacFarland had libeled it by claiming the company "coached" distributors to make "illegal claims" as part of their sales pitch. In what appears to be his response to this allegation, MacFarland frames the issue as whether his conclusion that testimonials by LifeVantage's spokespeople are " 'illegal' " is constitutionally protected opinion. Here again, however, MacFarland's arguments fall wide of their mark, because they fail to address the substance of LifeVantage's complaint. As we understand the argument, LifeVantage contends the libel consists in MacFarland's assertion that the company actively coaches its distributors to make illegal claims about the product. Thus, the disagreement centers not on the truthfulness or accuracy of any "testimonials" about the product, but rather on whether LifeVantage has a policy of coaching its distributors to make these allegedly illegal claims.

On this point, Eric Marchant, LifeVantage's vice-president for compliance, filed a declaration stating that the company does not permit or encourage others to make untrue statements about Protandim. Attached to the declaration were copies of LifeVantage's policies and procedures for independent distributors selling Protandim. These policies and procedures form a part of the LifeVantage Independent Distributors Agreement, and distributors are required to comply with its terms. Thus, LifeVantage presented evidence that it does not encourage illegal or false claims by its distributors and in fact actually prohibits them. This is sufficient to meet LifeVantage's burden of showing of probable merit. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 435.)

G.      *Improper Influence in Study Publication*

MacFarland characterizes as opinion his statements about Dr. McCord's ability to influence the publication of articles in the journal of which he was a board member. MacFarland argues he did not claim to have any direct knowledge of the approvals of each article but was merely "drawing inferences from his stated beliefs about the way the world works." In his view, he was simply commenting on the undisputed fact that favorable studies were published in a journal where Dr. McCord served as a board member and opining that these circumstances constituted a conflict of interest.

18

These characterizations aside, MacFarland's actual postings could reasonably be read differently. He claimed LifeVantage had hired Dr. McCord because, as a member of the board of directors of *Free Radical Biology*, he could get its studies published there. He went further, asserting that Dr. McCord's position on the board of the journal allowed McCord to give "rubber stamp approval for such articles." In explaining to a commenter why Protandim studies appeared on pubmed.com, MacFarland stated the studies were submitted to publications "because they have low standards or McCord is on the board." MacFarland told the commenter, "This *isn't* my 'belief.' This is *a fact* of how the system actually works." (Italics added.)

MacFarland's statement that Dr. McCord could give rubber stamp approval for articles could reasonably be interpreted as a factual claim that studies supportive of Protandim were published in *Free Radical Biology* only because McCord used improper influence to bypass the ordinary peer review process. Whether the articles were subject to the peer review process and whether Dr. McCord influenced that process are matters of fact that can be proved true or false. (*Lott v. Levitt* (N.D. Ill. 2007) 469 F.Supp.2d 575, 585 [claim that plaintiff " 'was able to buy an issue [of a journal] and put in only work that supported him' " appeared to state objectively verifiable facts and would not be interpreted as defendant's opinion]; see *Sanders v. Walsh, supra,* 219 Cal.App.4th at p. 864 [accusation that plaintiff was " 'giving all the construction business in Anaheim for a under the table bribe' " was not mere opinion].) Moreover, MacFarland's repeated assurances to his readers that he was reporting facts based upon his research into Protandim "works against any argument that [he] was merely stating the facts and drawing [his] own opinion from them." (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 904; see also *Bently Reserve, supra,* 218 Cal.App.4th at p. 429 [where Internet reviewer assured readers of his personal knowledge of situation, the "assurances suggest facts are being communicated, not opinions"].)

With regard to these statements, LifeVantage submitted sufficient evidence to carry its minimal burden as to the probable merit of its claim. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 435.) Dr. McCord stated his 2006 article on Protandim was

19

subjected to an anonymous peer review process before publication in the journal *Free Radical Biology & Medicine*. He explained his membership on the journal's board had nothing to do with the article's publication and stated he was not in any position to approve one of his papers that was subject to peer review. According to Dr. McCord, the purpose of the anonymous peer review process is "to avoid any conflict of interest or undue influence." As noted above, whether the article was published through the ordinary peer review process or only because of Dr. McCord's alleged influence is a matter of verifiable fact. (*Lott v. Levitt, supra,* 469 F.Supp.2d at p. 585 ["the editor of the Journal might be able to verify the truth of falsity of whether the Special Issue was reviewed by peers"].) In light of Dr. McCord's declaration, a reasonable trier of fact might conclude MacFarland's statements were not substantially true and were defamatory. (*Bently Reserve, supra,* 218 Cal.App.4th at p. 435.)

IV. *MacFarland Has Not Demonstrated LifeVantage Is a Limited Purpose Public Figure.*

The trial court ruled MacFarland had failed to show LifeVantage was a limited purpose public figure. MacFarland challenges this ruling on appeal, contending LifeVantage is a limited purpose public figure with respect to controversies concerning the creation and health benefits of Protandim.

A. *This Issue Was Perfunctorily Raised in MacFarland's Motion to Strike.*

This argument suffers from an initial procedural flaw. It was barely raised in MacFarland's motion to strike. MacFarland's legal memorandum in support of the motion devotes one two-sentence paragraph to this issue. The first sentence of that paragraph contends LifeVantage is a *general purpose* public figure. Only the second sentence could conceivably be read as making the argument raised here; it states in conclusory fashion that LifeVantage "is a public figure with regard to the controversy that surrounds its claims concerning the creation and health benefits of Protandim." The words "limited purpose public figure" are entirely absent.

Such a perfunctory contention is ordinarily insufficient to preserve a matter for appellate review. (See *Bently Reserve, supra,* 218 Cal.App.4th at pp. 435-436 [two-

20

sentence footnote in trial court reply brief insufficient to raise issue of malice in trial court; matter could not be raised for first time on appeal].) MacFarland's only substantive treatment of this issue came in his reply memorandum in the trial court, which did not permit LifeVantage the opportunity to respond to the factual material upon which MacFarland sought to rely. Where a party may suffer the striking of its complaint, "due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [on summary judgment, trial court improperly considered supplemental declaration filed with movant's reply papers, because nonmoving party was not informed of issues it was to meet in opposing motion].)

B.   *LifeVantage Did Not Inject Itself into Any Existing Controversy Surrounding its Allegedly Improper Business Practices.*

Setting the procedural issue aside, we cannot say the trial court erred. MacFarland contends the "controversy" surrounding Protandim predates his coverage of the issue. His opening brief appears to date the beginning of the controversy to 2005, when Dr. McCord went on television making claims about the product. MacFarland thus frames the controversy as one involving a debate about whether Protandim has health benefits. His second declaration in support of the motion to strike points to two other Internet postings discussing Protandim, including one by Dr. Harriet Hall expressing skepticism about the product's effect on health. Both of these postings discuss whether or not Protandim is beneficial, and one provides general links about LifeVantage and the product.

LifeVantage views the controversy quite differently. In its view, "the subject matter of the controversy instigated by MacFarland [concerns] accusations of deliberate fraud on scientific journals, the NIH and AHA, and the public" and whether LifeVantage was "engaging in a fraud to sell a worthless product." In its view, MacFarland has

21

admitted he created this controversy by claiming to have "uncovered" the Protandim "scam" and by "expos[ing] the lies the company has told[.]"[9]

"The limited purpose public figure is an individual who voluntarily injects him or herself or is drawn into a *specific public controversy,* thereby becoming a public figure on a limited range of issues." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577, italics added (*Ampex*). )  To become a limited purpose public figure, a party must inject itself into "an *existing* public controversy[.]"  (*Carver v. Bonds, supra,* 135 Cal.App.4th at p. 353, italics added.)  In what our colleagues in Division One have called "a much cited analysis" (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845), the court in *Waldbaum v. Fairchild Publications, Inc.* (D.C. Cir. 1980) 627 F.2d 1287 (*Waldbaum*) explained that "[t]o determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing *some specific question.*"  (*Id.* at p. 1297, italics added, fn. omitted; accord *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254-255 ["courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of *particular* public controversies"], italics added.)  It is therefore clear that the public controversy into which a limited purpose public figure thrusts itself must be one that existed *before* the defendant made the defamatory statements at issue, and the alleged defamation must be germane to the plaintiff's participation in that preexisting controversy.  (*Ampex, supra,* 128 Cal.App.4th at p. 1577.)

In this case, MacFarland contends "the 'controversy' concerns a miracle drug." But he fails to show that this alleged controversy is necessarily the same as the one generated by his alleged exposure of what he calls the Protandim scam and LifeVantage's fraudulent acts.  (See *Waldbaum, supra,* 627 F.2d at p. 1297, fn. 27 [controversy may

---

[9] MacFarland himself seems to distinguish between the subject matter of the postings on the health benefits of Protandim and his discussion of the alleged scam:  "Dr. Harriet Hall is referring to the product Protandim itself.  When I call LifeVantage Protandim a scam, I'm including additional information such as LifeVantage lying about the product being invented by a doctor, illegally pitching it as a medicine at distributor conventions, and other things that this website has uncovered."

have "subcontroversies" and that "the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases"].) On this point, the California Supreme Court's opinion in *Vegod v. American Broadcasting Companies., Inc.* (1979) 25 Cal.3d 763 (*Vegod*) is instructive. The plaintiffs in that case had been hired to conduct a going-out-of-business sale for the historic City of Paris department store, the closure of which had been widely reported in the news media. (*Id*. at p. 765.) The defendants reported in a news broadcast that the plaintiffs had been brought in to handle the closeout, " 'a closeout the Better Business Bureau says has deceived the public that trusts the name City of Paris and promises bargains that are not really bargains at all.' " (*Id*. at p. 766.) After the plaintiffs brought a defamation action, the trial court ruled they were public figures within the meaning of *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323. (*Vegod, supra,* 25 Cal.3d at p. 765.) The high court disagreed and rejected the argument "that the demise and closing out sale of the City of Paris were matters of public controversy because it was a 'landmark store.' " (*Id*. at p. 769.) Assuming the store's planned destruction had created a public controversy, the court held the plaintiffs could not be said "to have thrown themselves into the vortex of *that controversy*" because it did not appear the plaintiffs had "urged City of Paris publicly or otherwise to terminate business or to destroy the 'landmark.' " (*Ibid*., italics added.)

Similarly, in this case, even if LifeVantage engaged in a controversy over the health benefits of Protandim, that does not mean it thrust itself into a separate controversy over MacFarland's claims of fraud and illegal marketing practices before MacFarland raised those issues. A public controversy about the effectiveness of LifeVantage's product is not the same as a public controversy about LifeVantage's allegedly unethical business practices.[10] (See *Makaeff v. Trump University, LLC* (9th Cir. 2013) 715 F.3d

---

[10] In his reply brief, MacFarland does not squarely address LifeVantage's argument that the subject matter of the controversy at issue is LifeVantage's allegedly fraudulent activities and not any debate over the effectiveness of Protandim. Instead, his reply brief simply assumes his description of the subject matter of the public controversy is the

254, 267 [California law; distinguishing general interest in Trump University and Donald Trump from dispute over Trump University's business and educational practices].) Moreover, the company's marketing of Protandim did not make it a public figure or create a public controversy. (*Melaleuca, Inc. v. Clark, supra,* 66 Cal.App.4th at p. 1363.) And "*Vegod's* observation that the plaintiff must 'become part of an *existing* public controversy' to be considered a limited purpose public figure (. . . italics added) confirms that [MacFarland] could not create a public controversy simply by publishing . . . article[s] that put [LifeVantage's] behavior in the spotlight[.]" (*Carver v. Bonds, supra,* 135 Cal.App.4th at p. 354.) Thus, LifeVantage's *response* to MacFarland's accusations cannot be used to make the company a limited purpose public figure. (*Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135.)

MacFarland also does not discuss the evidence LifeVantage put before the trial court concerning the absence of Internet or press coverage of Protandim scams or LifeVantage's allegedly illegal or fraudulent activities before MacFarland raised these issues. According to the declaration of Bruce Carl Anderson of Cyber Investigation Services, LLC, before MacFarland's posting in November 2010, there was no coverage of alleged lies or scams by LifeVantage or about Protandim or about LifeVantage defrauding people, breaking the law, or making illegal claims. If credited, this evidence would show there was no "existing public controversy" on these topics into which LifeVantage could have inserted itself. (*Carver v. Bonds, supra,* 135 Cal.App.4th at p. 353.) This further supports the trial court's finding that MacFarland did not meet his burden of showing LifeVantage was a public figure.[11]

---

correct one. Since MacFarland has not responded to LifeVantage's argument on this point, we deem the matter submitted on LifeVantage's response. (*Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 338-339.)

[11] Our conclusion that the trial court did not err in finding LifeVantage was not a public figure makes it unnecessary for us to address MacFarland's argument that LifeVantage failed to show malice.

V.     *LifeVantage Has Adequately Shown Entitlement to Remedies.*

MacFarland's final argument is that LifeVantage cannot show it is entitled to monetary damages or any other remedy, and thus it cannot prevail. In the court below, however, LifeVantage introduced declarations from its distributors explaining their sales of Protandim had been adversely affected by MacFarland's web postings. In addition, LifeVantage's chief financial officer declared the company had spent thousands of dollars to investigate MacFarland's statements. LifeVantage has therefore produced evidence it has lost income due to MacFarland's allegedly defamatory statements.[12] This is sufficient to meet its burden of showing it has suffered actual damages as a result of MacFarland's publications. (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pp. 905-906.) Furthermore, LifeVantage argues, and MacFarland does not dispute, that its investigation expenses qualify as special damages compensable under Civil Code section 48a, subdivision 4(b).

MacFarland argues some of the statements about which LifeVantage complains may not be actionable, but in resisting the motion to strike, LifeVantage need not produce evidence that it "can recover on every possible point urged. It is enough that the plaintiff demonstrates that the suit is viable, so that the court should deny the special motion to strike and allow the case to go forward." (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 905.)

MacFarland also contends LifeVantage has not shown it would be entitled to an injunction against the allegedly defamatory speech, because such an injunction would be a prior restraint and an infringement on his First Amendment rights. There is a crucial difference, however, between "requests for preventive relief prior to trial and posttrial remedies to prevent repetition of statements judicially determined to be defamatory." (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1158.) If a jury has already determined the statements are defamatory, " 'the constitutional problems of a

---

[12] Indeed, MacFarland effectively acknowledged he had caused LifeVantage to lose sales. In one post, he wrote, "When I expose Protandim for being the scam that it is, their jobs in selling the product and/or recruiting people to be salesmen become more difficult."

prior restraint are not present[.]' " (*Ibid*.)  If LifeVantage succeeds in proving the challenged statements are libelous, then it will have obtained a judicial determination they are defamatory, and a properly tailored posttrial injunction to prevent their repetition should pose no constitutional problem of prior restraint.

DISPOSITION

The order denying the special motion to strike is affirmed.  LifeVantage shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1),(2).)


_____

Jones, P.J.


We concur:


_____

Simons, J.


_____

Bruiniers, J.